Timothy W. SWAIN and Katherine A. Swain, Plaintiffs,

v.

Claude S. BRINEGAR, Individually and as Secretary of Transportation for the United States, Washington, D. C., et al., Defendants.

No. P–CIV–74–53.

United States District Court, S. D. Illinois, N. D.

July 26, 1974.

Mishael O. Gard and Timothy W. Swain (Swain, Johnson & Gard), Peoria, Ill., for plaintiffs.

Raymond L. Terrell, Special Asst. Atty. Gen., (Drach, Terrell & Deffenbaugh, P. C.), Springfield, Ill., Max J. Lipkin, Asst. U. S. Atty., Peoria, Ill., Victor M. Pilolla, Asst. U. S. Atty., Springfield, Ill., for defendants.

## DECISION AND ORDER

ROBERT D. MORGAN, Chief Judge.

By this action, the plaintiffs seek to permanently enjoin the defendant Illinois and federal highway officials from taking further steps toward the acquisition of right-of-way or the construction of a proposed federal aid highway, designated as FAP 406. A temporary restraining order was entered by consent of the parties on June 3, 1974. On motion of the defendants, the hearing on the plaintiffs' application for a preliminary injunction was consolidated with the trial of the case on the merits, as permitted by Rule 65(a)(2) of the Federal Rules of Civil Procedure. Evidence was taken at an extended hearing on June 19, 1974, and the court has had the benefit of scholarly briefs from counsel for the parties.

The proposed highway, which is in issue here, would run between Lincoln, Illinois, and the Delavan junction of Illinois Route 121. Upon completion of the program, the cities of Peoria and Springfield would be connected with limited access freeways by interchanging with I–74 southeast of Peoria and with I–55 near Lincoln. The origins of FAP 406 date back to a 1967 study of Illinois' highway needs which was commissioned by the State. That study recommended the creation of a supplemental freeway system for Illinois, of which FAP 406 is just one part, which would be built to Interstate highway standards and supplement existing Interstates.

Subsequently, in 1969, the Illinois Division of Highways released a corridor report for FAP 406. It recommended a corridor designated as Alternate A,

which contains the presently proposed highway alignment. Two other corridor alternates, designated as Alternates B & C, were studied, but rejected by that report. Shortly after release of that report, a public hearing was held in Lincoln, Illinois (July 2, 1969), and thereafter corridor approval was given Alternate A by the Federal Highway Administration (FHWA) (September 2, 1969). Thereafter, the State prepared a draft Environmental Impact Statement (EIS) and a design location study, approval was obtained from the FHWA (Sept. 1972), a design public hearing was held (November 9, 1972), and the FHWA gave final design approval to FAP 406 (October 23, 1973), following a review of the final EIS.

As finally approved, FAP 406 will traverse the plaintiffs' jointly-owned, 440-acre farm, which is located in Tazewell County, and necessarily subject part of that farm to condemnation proceedings. Plaintiffs contend that this will divide and destroy the farm as a producing unit as presently operated. Such contention is not effectively disputed here; but it would appear that this is a subject which can be properly evaluated in condemnation. In Count I of this complaint, the named plaintiffs sue in their own behalf, and their standing to sue in that capacity is not disputed.

In Count II of the complaint, the same named plaintiffs seek to sue on behalf of two described classes of persons, pursuant to Rule 23 of the Federal Rules of Civil Procedure.[1] A class action is inappropriate in the circumstances of this case, however, because the plaintiffs clearly fail to show satisfaction of the prerequisite of Rule 23(a)(4), that they be representative parties who "will fairly and adequately protect the interests of [either] class."

By this lawsuit the plaintiffs seek *inter alia* to force the defendants to reconsider the location of FAP 406. If they are successful in that, it is most likely that a different route would ultimately be selected, and other members of either class, whom the plaintiffs here seek to represent, might lose land to a highway. Thus, it is apparent that the interests of the named plaintiffs may be antagonistic to the interests of some of the members of the class they seek to represent. Furthermore, there is no indication of desires of any members of either class, and it is entirely possible that many members desire completion of the highway as planned as soon as possible. It seems of some interest in this connection that plaintiffs are among very few owners whose land is needed for this project who have not already committed it. Accordingly, a class action may not be permitted, and Count II must be dismissed without further consideration.

At the time of the hearing herein, the state and federal defendants filed a motion to dismiss, which was taken under advisement. Therein they asserted three grounds for dismissal of plaintiffs' action, each of which must be rejected, for reasons as follows:

(1) The plaintiffs have successfully stated a claim upon which relief might be granted. Substantial federal issues are raised relating to the adequacy of the corridor and design studies and hearings, which may be resolved

---

1. Count II, as amended, defines the classes of persons whom the plaintiffs endeavor to represent to include:

"(a) all owners and tenants and users of farm land in the State of Illinois who are subject to having farm land they own and farm land from which they make their livelihood condemned for the purposes of the construction of public highways, without being afforded fair notice and hearing and afforded the protection of the National Environmental Protection Act of 1969, and (b) all owners and tenants and users of farm land in the State of Illinois who are subject to having farm land they own and farm land from which they make their livelihood condemned for the purpose of the construction of Federal Aid Route 406 and including those who have already conveyed or agreed to convey their property under threat of condemnation."

only in light of the particular facts surrounding the proposed federal project and not through the cold and summary assertions of the pleadings.

■■ (2) The doctrine of laches is an equitable doctrine to be invoked in the discretion of the court. While the defendants point to cases wherein it has been invoked to bar belated environmental challenges to governmental projects, in this case any delay by plaintiffs is clearly not so unreasonable nor any prejudice to the defendants so great as to justify dismissal. Though much right-of-way has been acquired and substantial planning costs have been incurred, the "public interest status accorded ecology preservation by the Congress" militates against an application of laches here. *See* First National Bank of Chicago v. Richardson, 484 F.2d 1369, 1372 (CA 7 1973); Arlington Coalition on Transportation v. Volpe, 458 F.2d 1323, 1329–1330 (CA 4 1972).

■■ (3) The defendants' contention that the plaintiffs failed to exhaust their administrative remedies has almost no basis in fact. To a significant degree, the plaintiffs voiced their objections to the proposed project, almost from the beginning, both orally and in writing. The only issue which the defendants claim the plaintiffs did not raise in the administrative proceedings —namely, the impact on the world food shortage of the removal of the farmland involved from production—is so obvious that the defendants must have been aware of it as a consideration.

■■ Before turning to a discussion of the principal issues, two lesser questions may be disposed of, with only brief discussion. First, the plaintiffs' due process of law challenge to the conduct of the design hearing is without merit. The State defendants' refusal to discuss corridor alternates at that hearing may properly be subject to attack under NEPA, but it simply does not raise any question of constitutional dimensions. Second, it is contended by plaintiffs that a new corridor hearing should be required on the theory that the 1969 hearing was rendered a nullity by the Illinois Supreme Court's decision holding the Illinois Trust Authority Act unconstitutional. Rosemont Building Supply, Inc. v. Illinois Highway Trust Authority Act, et al., 45 Ill.2d 243, 258 N.E.2d 569 (1970). This argument is equally insubstantial. The validity of the corridor hearing is in no way related to the validity of the state highway act in effect at the time of the hearing. The adequacy of the corridor hearing is dependent only upon Section 128 of Title 23, United States Code. New hearings will not be required simply because FAP 406 will be paid for from a different fund than that from which it was expected to be paid for in 1969.

## BASIC ISSUES AND SCOPE OF REVIEW

Three basic issues are raised by this action, to-wit:

(1) whether the state and federal defendants complied with the hearing and disclosure requirements of Section 128, Title 23, United States Code, and Public Policy Memorandum 20–8 (PPM 20–8), which was promulgated thereunder;

(2) whether the final Environmental Impact Statement (EIS), which was prepared and filed in the design hearing stage of this project, complies with the National Environmental Policy Act (NEPA);

(3) whether the actual preparation of the EIS by the responsible state authorities, at the request of the FHWA, complies with the requirements of NEPA.

■ In order to determine whether the defendants have complied with the requirements of Section 128 and NEPA, it is necessary to conduct a searching inquiry into the facts, but the ultimate standard of review remains relatively narrow. The court is not empowered to substitute its judgment for that of the state or federal highway authorities. Rather, the review is for the limited purpose of determining whether the responsible officials acted with a full,

good-faith consideration of their legal obligations and whether the actual balance of costs and benefits struck by the officials was arbitrary or clearly gave insufficient weight to environmental factors. *See* Environmental Defense Fund, Inc. v. Corps of Engineers, 470 F.2d 289, 300 (CA 8 1972).

## COMPLIANCE WITH THE REQUIREMENTS OF 23 U.S.C. § 128 and PPM 20–8

The plaintiffs challenge the adequacy of the corridor report and its accompanying hearing [2] on the ground that the state and federal defendants did not give sufficient consideration to the environmental effects of the proposed improvement as required by 23 U.S.C. § 128 [3] and PPM 20–8. [4]

■ Clearly, the defendants were required to consider the social, economic, and environmental effects [5] of the proposed improvement at the corridor hearing stage of the project. This court believes, however, that plaintiffs tend to exaggerate the mandate of Section 128 and PPM 20–8. It must be observed and remembered that the thrust of those provisions is directed less at the matter of environmental disclosure than toward the need for public imput into the decision-making process. Senate Report No. 1340, 90th Cong., 2nd Sess. (1968), p. 10, 1968 U.S.Code Cong. & Admin.News, p. 3482. It should be further noted that the regulation may not go further in substantive requirements than the statute which authorizes it.

■ In order to insure effective public participation, it is necessary that the corridor report fully reveal the contents of the defendants' studies, the alternatives studied, and the principal features and effects of the recommended route. But in 1969 there was no valid requirement that the highway authorities must develop a given quantity of information on any predetermined set of subjects.

■ Here, the corridor report devotes greater attention to the social and economic effects of FAP 406 than to its environmental effects. This does not invalidate the report, however, inasmuch as the social and economic effects may reasonably be said to predominate, and the lack of attention given the environmental effects may well be due to the relatively slight environmental conse-

2. The plaintiffs also challenge the adequacy of the design public hearing, under Section 128 and PPM 20–8, but inasmuch as the design hearing is also subject to the stiffer environmental disclosure requirements of NEPA, its adequacy will be tested hereinafter by the standards of that Act.

3. At the time of the corridor hearing in 1969, 23 U.S.C. § 128 provided in part as follows:

"Any State highway department which submits plans for a Federal-aid highway project involving the bypassing of, or going through, any city, town, or village, incorporated or unincorporated, shall certify to the Secretary that it has had public hearings, or has afforded the opportunity for such hearings, and has considered the economic and social effects of such a location, its impact on the environment, and its consistency with the goals and objectives of such urban planning as has been promulgated by the community . . . ."

Section 128 was later amended, in 1970, by P.L. 91–605, to add a requirement for written consideration of the economic, social and environmental effects of a given project.

4. Paragraph 9 of PPM 20–8 provides in part as follows:

"State Highway Departments shall consider social, economic, and environmental effects before submission of a request for location or design approval, whether or not a public hearing has been held . . . ."

Paragraph 10d(1)(d) authorizes federal approval of a route location only after "the requirements of this PPM" have been satisfied. PPM 20–8, as revised, may be found at 23 C.F.R. § 790.1, et seq.

5. Paragraph 4c of PPM 20–8 defines the term "social, economic, and environmental effects" to mean "the direct and indirect benefits or losses to the community and to highway users," including 23 factors listed therein, insofar as they are "relevant and applicable" to the particular location or design under consideration.

quences of the project. *See* Iowa Citizens for Environmental Quality, Inc. v. Volpe, 487 F.2d 849 (CA 8 1973). Moreover, it is important to bear in mind that since 1969 our society's awareness and concept of "environment" has undergone considerable growth, and the defendants' efforts, then, should not be viewed by the light of today's standards.

It is further contended by the plaintiffs that the corridor report is inadequate under Section 128 because it discusses only a limited number of alternate corridors and ignores alternatives to the construction of any limited access, four-lane highway, whatsoever. Evidence received at the hearing, however, indicates that the defendants did consider other alternatives, including: (1) upgrading existing Route 121; (2) construction of a four-lane, limited-access-controlled facility over Route 121; or (3) no highway improvement at all. Strong and obvious considerations of safety, efficient highway transportation, and ease of construction may reasonably be said to have outweighed, in the determination, the advantages attributable to the alternatives.

■■■ In summary, there is nothing in the record of this case to support the charge that the corridor report was not prepared in good faith or that the approval of the recommended corridor was arbitrary or capricious. Though plaintiffs also present reasonable arguments to support their contrary conclusions on these public decisions which have been made, the court, even if it agrees with plaintiffs, must not substitute its conclusions under these circumstances. The court must not seek to be a "super" Department of Transportation for either the state or federal government.

## ADEQUACY OF THE FINAL ENVIRONMENTAL IMPACT STATEMENT

The environmental disclosure required by NEPA goes substantially beyond that demanded by Section 128 and PPM 20–8. Section 102(2)(C), which is the heart of the Act, requires that the responsible federal official include an EIS "in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment." Section 102(2)(D) further requires that the responsible agency "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."

NEPA became effective January 1, 1970, and thus was not law at the time of the corridor hearing. Nonetheless, it is not disputed that NEPA applies to FAP 406 as an ongoing project, and that the defendants are obliged to comply with the Act to the "extent possible."

■■■ The EIS, here, filed in connection with the design hearing, is a considerably more comprehensive document than the corridor report which was prepared earlier. In the impact statement, separate and distinct treatment is accorded each of the five areas of concern listed in Section 102(C).[6] In each instance, the analysis is considered by this court to be sufficiently detailed to satisfy the requirements of NEPA.

■■■ Plaintiffs assert that the statement filed for FAP 406 fails to explore in sufficient detail alternatives to the proposed route and that it does not explore certain relevant environmental questions in adequate depth. A number of inquiries are suggested by the plain-

---

6. Section 102(2)(C) of NEPA, 42 U.S.C. § 4332(2)(c), requires "a detailed statement" on:

    (i) the environmental impact of the proposed action;

    (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

    (iii) alternatives to the proposed action,

    (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

    (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

tiffs which they believe should have been made, including extensive chemical pollution tests, the desirability of alternative modes of transportation, and the effect of the removal of farmland from production on the world hunger problem. While unending study of these matters would, no doubt, be beneficial, the failure of the defendants to conduct such studies and to arrive at conclusions thereon here does not render the impact statement inadequate. These questions have a general significance that extends far beyond the limited project envisioned here. It is simply not feasible to hold up a project such as this pending such studies. It would be grossly impractical to do so. An exhaustive examination of every conceivable minor environmental effect of a given project, even though patently and cumulatively detrimental, is simply not required by NEPA.

■ Nor does the defendants' failure to reconsider in greater depth the available alternatives to the proposed corridor invalidate the EIS. It is evident that the corridor selection process was reviewed during the preparation of the impact statement, at least partly at the suggestion of the FHWA. At that time the defendants apparently concluded that the selection of the recommended corridor was reasonable and that no new circumstances had arisen in the meantime which justified reopening the matter. This approach is not inconsistent with the mandate of NEPA that the Act be complied with to the "extent possible." *See* Citizens to Preserve Foster Park v. Volpe, 466 F.2d 991, 997 (CA 7 1972).

■ The plaintiffs' further argument that the EIS is insufficient because it does not study a "substantial length of highway," as required by PPM 90–1,[7] must also fail. The testimony here shows that the northern terminus of the highway section, studied here, is the established alignment of a 3½ mile stretch of four-lane, limited-access highway in the vicinity of Hopedale, Illinois, and which runs along the alignment of Route 121 and embraces the intersection with Route 122 to Hopedale. This completed freeway fragment constitutes a major highway control element and is necessarily a logical terminus for the segment of highway covered by the EIS here. It would be irrational not to connect to it. The southern terminus is Interstate Route 55 at Lincoln, Illinois, over 15 miles away, so the section under study is as long as it can be—surely "as long as practicable."

## PREPARATION OF THE ENVIRONMENTAL IMPACT STATEMENT BY THE STATE DEPARTMENT OF TRANSPORTATION

Section 102(2)(C) of NEPA requires that the responsible federal official provide an EIS. The specific responsibilities of that official are in no way detailed.

PPM 90–1, which was promulgated by the United States Department of Transportation, effective August 24, 1971, is more specific, however. Section 6 of that memorandum provides that the draft EIS should be prepared by the sponsoring state agency, that it be approved by the FHWA, that it be circu-

---

7. Section 6 of PPM 90–1, 37 Fed.Reg. 21809 (Oct. 14, 1972), provides that:
   "The highway section included in an Environmental Statement should be as long as practicable to permit consideration of environmental factors on a broad scope. Piecemealing proposed highway improvements in separate Environmental Statements should be avoided. If possible, the highway section should be of sufficient length that would normally be included in

a multi-year highway improvements program."
   Section 3A of PPM 90–1 defines highway sections as:
   "A substantial length of highway between logical termini (major crossroads, population centers, major traffic generators, or similar major highway control elements) as normally included in a single location study."

lated to appropriate interested agencies for comment, and that later the final EIS, including copies of all comments received, shall be forwarded to the FHWA, and the FHWA shall review the statement, modify it as necessary, and when appropriate adopt it as its own.

While an administrative interpretation of a statute is not definitive, it is entitled to great deference, if reasonable. Plaintiffs argue that this duty may not be delegated, yet it must be apparent that one man will not be able to do all the work in development of every EIS in the nation. He must delegate much to many people. In the instant case it is clear that the procedures outlined in PPM 90–1 were followed. Although NEPA does not specifically authorize federal agencies to delegate the responsibility of preparing an EIS, such a delegation to state agencies does not violate the spirit of NEPA, provided that the federal agency comprehensively considers and reviews both the draft and final EIS. Thus, State preparation of the EIS is not, in and of itself, violative of Section 102. *See* Iowa Citizens for Environmental Quality, Inc. v. Volpe, 487 F.2d 849, 853–855 (CA 8 1973).

But the plaintiffs contend that even if state preparation of the EIS is not improper *per se*, the FHWA, nevertheless, failed to live up to its full statutory obligation to thoroughly review the EIS after its preparation by the state. The administrative record in this case, however, belies the notion that the FHWA "rubber stamped" the impact statement.

Correspondence between state and federal officials, following preparation of the draft EIS, reveals that representatives of the FHWA made thoughtful comments on aspects of the highway project which indicate that they seriously studied the statement. Among other things, they remarked on the loss of 750 acres of farmland and suggested that the EIS discuss the corridor alternates which were considered. The fact that the final EIS was approved without change is not surprising, in that the FHWA presumably voiced all of its criticisms prior to the preparation of the final EIS.

Despite a spirited, scholarly, and determined effort, the plaintiffs have failed to produce sufficient evidence to overcome the presumption of regularity that arises from FHWA compliance with the administrative procedures set forth in PPM 90–1, or to rebut the evidence contained in the administrative record that a conscientious effort was made to comply with the law without indulging in arbitrary conclusions. Perhaps, quite understandably, plaintiffs would build the highway elsewhere, or would not build it at all; but the test of statutory compliance simply cannot be one of satisfying the objections of all concerned. Failure to do so does not make objectionable conclusions arbitrary.

The defendants' motion to dismiss must be denied; but judgment on the merits must be entered for the defendants and the existing injunction must be dissolved.

Facts and conclusions stated in the foregoing discussion constitute the findings of fact and conclusions of law required by Rule 52(a), F.R.Civ.P.

Accordingly, it is ordered that judgment is entered on the merits hereof in favor of the defendants and against the plaintiffs.

It is further ordered that the Preliminary Injunction entered on June 21, 1974 is vacated and the case is dismissed.