**Timothy W. SWAIN and Katherine A. Swain, Plaintiffs-Appellants,**

v.

**Claude S. BRINEGAR, Individually and as Secretary of Transportation for the United States, et al., Defendants-Appellees.**

No. 74–1625.

United States Court of Appeals, Seventh Circuit.

Argued Jan. 26, 1976 (en banc).

Decided July 20, 1976.

Mishael O. Gard, Peoria, Ill., for plaintiffs-appellants.

Raymond L. Terrell, Sp. Asst. Atty. Gen., Springfield, Ill., Larry G. Gutterridge, Atty., Dept. of Justice, Washington, D. C., Donald B. Mackay, U. S. Atty., Springfield, Ill., William J. Scott, Atty. Gen., Chicago, Ill., for defendants-appellees.

Before FAIRCHILD, Chief Judge, and SWYGERT, CUMMINGS, PELL, SPRECHER, TONE and BAUER, Circuit Judges.*

CUMMINGS, Circuit Judge.

Plaintiffs brought this suit to enjoin further action on acquisitions and construction of a 15-mile segment of a proposed Federal Aid Highway project consisting of a 42-mile supplemental freeway connecting Peoria and Lincoln, Illinois. At present, the two cities are connected only by Illinois Route 121, a two-lane highway. The Lincoln-Peoria proposal was designated FAP 406 and divided into two components. The northerly portion runs from Route I–74 south of Peoria to a point between Delavan and Hopedale, Illinois, on the south. The southerly portion is the immediate subject of this suit and runs 15 miles from the point between Delavan and Hopedale south to an interchange with Interstate I–55 just northwest of Lincoln. The northern terminus of this 15-mile segment would connect with an already constructed 3½ mile stretch at the south end of the other segment of FAP 406.

This project developed as a result of a 1967 study of the long-range needs of Illinois for additional highways. That study recommended that the state construct an 1800-mile trunk system of interstate roadways and supplemental freeways designed to connect every Illinois city of over 25,000 population. FAP 406 is one of those connecting roads.

Plaintiffs are the owners of a 440-acre farm, part of which lies in the path of the new highway. Their major contentions are that the defendants, in planning and describing to the public FAP 406, failed to comply with the Federal Aid Highway Act, 23 U.S.C. §§ 101 et seq., and the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq. The plaintiffs argued that the procedure used to select the corridor in which FAP was to be located was arbitrary and in violation of the legislative policy of full public disclosure in the Federal Aid Highway Act. In addition, the plaintiffs challenged the adequacy of the Environmental Impact Statement (EIS) because preparation had been improperly delegated to a state agency and because, in any event, the document was insufficient under the requirements of NEPA. After a hearing, the district court rendered an opinion on the merits in defendants' favor. *Swain v. Brinegar,* 378 F.Supp. 753 (S.D.Ill. 1974). Last year a unanimous panel of this Court validated the corridor selection procedures for this part of the 42-mile supplemental freeway to be constructed from Lincoln to Peoria, Illinois. However, by a divided vote, this Court held that there was an improper delegation of authority to the Illinois Department of Transportation with respect to the EIS required by 42 U.S.C. § 4332(2)(C). 517 F.2d 761, 776–779.

Thereafter, Congress amended NEPA by providing in Public Law 94–83 that an EIS "shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official" if (1) the state agency has statewide jurisdiction, (2) the federal official furnishes guidance and participates in its preparation, (3) the federal official independently evaluates such statement prior to its approval and adoption, and (4) after January 1, 1976, the federal official notifies and solicits the views of "any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts" upon such entity.[1] The amendment, however, does not relieve the federal official "of his responsibilities for the scope, objectivity, and contents of the entire" EIS. 89 Stat. 424; 42 U.S.C. § 4332(2)(D). To determine the effect of this amendment on our prior ruling, we granted a rehearing *en banc.*

---

* Since Judge Wood was not a member of this Court at the time of the argument, he took no part in the disposition of this case.

1. With respect to this fourth condition, the statute also provides if there is any disagreements on such impacts, the federal official must prepare a written assessment of such impacts and views for incorporation into the EIS.

■ It is clear that the decision of the panel can no longer stand in light of the NEPA amendment. The EIS was prepared by the Illinois Department of Transportation, an agency having statewide authority. The record reveals that the draft and final statements were adequately reviewed by the Federal Highway Administration (FHWA) and that it furnished sufficient guidance to the state. The federal participation was not limited to the FHWA, for the appendix to the EIS discloses that the document was considered by each federal agency with an interest in the matter. Most importantly, the FHWA complied with the purposes of NEPA, as amended, by accepting and exercising final authority for the evaluation of the environmental impact of the proposal. See Senate Report No. 94–52, pp. 10–11, 2 U.S.Code Cong. & Admin.News, pp. 859, 868 (1975); *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 531 F.2d 637, 639 (2d Cir. 1976).

■ Since the amendment to NEPA contained in Public Law 94–83 overruled our prior holding that the delegation of authority by the federal agency to the Illinois Department of Transportation was unlawful, we must rule on the sufficiency of the final EIS prepared by the Illinois Department of Transportation and approved by the Federal Highway Administration on August 9, 1973. This involves determining not only whether the EIS complied with the requirements of NEPA that it address certain factors, but also whether the scope of the EIS is at least as broad as the scope of "the 'federal action' being taken." *Aberdeen & Rockfish R. Co. v. SCRAP*, 422 U.S. 289, 322, 95 S.Ct. 2336, 45 L.Ed.2d 191 (*SCRAP II*). We find no flaw with the EIS to the extent it evaluates the 15-mile segment between Delavan and Lincoln. However, the federal action here concerns the construction of FAP 406, the whole supplemental 42-mile freeway, and not merely the Delavan-Lincoln segment. Since the EIS before us considers only the southern 15-mile segment, it was insufficient under NEPA and the pertinent regulation.

Under Section 102(2)(C) of NEPA, the EIS is to include a "detailed statement" on—:

"(i) the environmental impact of the proposed action,

"(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

"(iii) alternatives to the proposed action,

"(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

"(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. * * * (42 U.S.C. § 4332(2)(C))

Our study of the present EIS, consisting of forty-six pages of textual material and numerous maps, charts and pictures, persuades us of the statutory adequacy of the EIS if this 15-mile segment of FAP 406 were to be considered alone. The EIS gives the requisite "hard look" at the proposed action. *SCRAP II, supra*, 422 U.S. at 322, 95 S.Ct. at 2336.

The EIS considered the reasonable alternatives to building the proposed 15-mile segment including:

"a.) upgrading existing Illinois Route 121 to a full-access controlled high speed facility, b.) constructing a full-access controlled Freeway on a new alignment which would serve the same traffic as existing Illinois Route 121 and c.) not to construct the highway improvement." (Exhibit 2 to Appendix 1D)

In the EIS, the need for a new road was specifically explained on the basis of the growth in traffic and the expansion of the communities to be served by the highway. The benefits and drawbacks of the alternative locations, such as upgrading Route 121, were weighed against the advantages and disadvantages of the suggested path. We believe that this section of the EIS fully complies with NEPA's mandate. *Friends of the Earth v. Coleman*, 513 F.2d 295,

297–298 (9th Cir. 1975); *Trout Unlimited v. Morton,* 509 F.2d 1276, 1285–1286 (9th Cir. 1974); *Environmental Defense Fund, Inc. v. Corps of Engineers,* 470 F.2d 289, 296–297 (8th Cir. 1972), certiorari denied, 412 U.S. 931, 93 S.Ct. 2749, 37 L.Ed.2d 160.

■ Further, the EIS considered all of the relevant environmental consequences of the proposed highway, including the taking of 700 acres of farmland, the increase in noise and air pollution and the harm caused by any changes in the land grading. An EIS need not review all possible environmental effects of a project. It is sufficient if it considers only those which are "reasonably foreseeable." *Carolina Environmental Study Group v. United States,* 166 U.S.App. D.C. 416, 510 F.2d 796, 798–799 (1975); *Trout Unlimited v. Morton, supra,* 509 F.2d at 1283. Finally, the district judge gave satisfactory reasons for holding that the EIS discussion of the adverse environmental effects was sufficiently detailed. 378 F.Supp. at 759–760. This aspect of the EIS therefore meets the standards set forth in *Sierra Club v. Froehlke,* 486 F.2d 946, 952–953 (7th Cir. 1973); see also *Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1027–1028 (4th Cir. 1975), certiorari denied, 423 U.S. 912, 96 S.Ct. 216, 46 L.Ed.2d 140; *Daly v. Volpe,* 514 F.2d 1106, 1111–1112 (9th Cir. 1975); *Iowa Citizens for Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 851–853 (8th Cir. 1973).

However, we cannot agree that it was proper to confine the EIS to this 15-mile segment. Based on the standards articulated in NEPA, the regulation and the cases, it is clear that under the facts of this case, the proposed federal action being taken includes funding the entire 42 miles of FAP 406. Therefore, the judgment of the district court must be reversed.

■ Initially, the state defendants assert that this point was neither raised in the pleadings nor "at any time in the proceedings before the filing of Appellants' brief

following the hearing before the trial court" (Br. 21). But plaintiffs fully attacked the EIS with respect to this project in paragraphs 15, 17(i) and 18 of their complaint; this very point was argued before the trial court judge and was considered in his opinion. 378 F.Supp. at 760. Therefore, it is ripe for decision here.

We are supported in our conclusion that "the proposed action" within the meaning of Section 102(2)(C) of NEPA covers the entire 42 miles of FAP 406 by the pertinent regulation contained in the Federal Highway Administration's Policy and Procedure Memorandum (PPM) 90–1, setting forth guidelines for implementing Section 102(2)(C) of NEPA. Section 6 of that PPM provides:

"The highway section[2] included in an environmental statement should be as long as practicable to permit consideration of environmental matters on a broad scope. Piecemealing proposed highway improvements in separate environmental statements should be avoided. If possible, the highway section should be of substantial length that would normally be included in a multiyear highway improvement program." (See 23 C.F.R. § 771.5(a) for the current wording.)

■ The purpose of the PPM standards and those fashioned by the courts is to insure that any assessment of the environmental impact of the project will be meaningful. Segmentation of highway projects, although necessary to make their design and construction more manageable, can limit the usefulness of environmental impact studies in two significant ways. First, the project can be divided into small segments; although the individual environmental impact might be slight, the cumulative consequences could be devastating. Second, the location of the first segment may determine where the continuation of that roadway is to be built. In such a case, preparation of the EIS for the extension is no more than a

---

2. Section 3(a) of that PPM defines a highway section as:

"A substantial length of highway between logical termini (major crossroads, population

centers, major traffic generators, or similar major highway control elements) as normally included in a single location study." For the current version, see 23 C.F.R. § 771.3(g).

formal task because the decision-maker's ability to choose a different route no longer exists. On the other hand, an EIS need not consider the long-term visions of highway designers and urban engineers when they suggest comprehensive plans which may take years to construct, if they are to be built at all. The information contained in an EIS for such a comprehensive plan is likely to be speculative, irrelevant to the specific question before the decision-maker, and outdated by the time the choice must be made. To require the preparation of such an EIS would surely impose an undue burden on the state and federal agencies.

The purpose of NEPA is to require that federal decision-makers consider the environmental consequences of their actions before deciding to proceed. Their source of information, the EIS, must therefore take a pragmatic and realistic view of the scope of the action being contemplated. The view must be one neither confined by the literal limits of the specific proposal nor one unbounded except by the limits of the designer's imagination. The task of the court is not to decide where to draw the line, but to review the matter to ascertain whether the agency has made a reasonable choice. The courts which have faced this problem—determining the scope of a proposed highway project—have looked for certain key attributes of the highway proposal: whether the highway has an independent utility, whether it has logical termini, and whether it forecloses any avenues for expansion. *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra*, 531 F.2d at 639; *Daly v. Volpe, supra*, 514 F.2d at 1108–1109 (9th Cir. 1975); *Indian Lookout Alliance v. Volpe*, 484 F.2d 11, 17–20 (8th Cir. 1973); *Named Individual Members of San Antonio Conservation Society v. Texas State Highway Department*, 446 F.2d 1013, 1022–1024 (5th Cir. 1971), certiorari denied, 406 U.S. 933, 92 S.Ct. 1775, 32 L.Ed.2d 136.

For instance, in *Indian Lookout Alliance v. Volpe, supra*, the district court had held that an EIS was required for 14 miles of the Freeway 518 project to run from Missouri line at Keokuk, Iowa, north and westerly to the Minnesota line. In reversing and requiring a longer "umbrella" EIS, the Eighth Circuit held that the 14-mile segment was an inappropriate one for an EIS because "it does not have an independent utility of its own, which would require that it end in major termini, *i. e.* present major highways or cities." 484 F.2d at 19. Therefore, the court concluded that the EIS would have to include another project and an extension thereof, apparently 38 miles in all, so that the proposed Freeway 518 would intersect with U.S. 218, a major highway. 484 F.2d at 20.

In his well-reasoned opinion in *Indian Lookout Alliance*, Judge Gibson agreed with the plaintiffs there that division of a highway into segments such as here "precludes meaningful compliance with the statutory mandate to assess in detail environmental impacts, as each segment that is approved limits the alternatives for each succeeding segment." 484 F.2d at 17–18. In language exactly fitting our situation, the court added:

> "If the major objective of a proposal is to connect two cities by expressway, then these two termini should determine the proper scope of the EIS" (idem).

■ Taken together, the factors used by the courts and PPM 90–1 suggest that the scope of the proposed project can be determined by applying the following three standards:

1. Does the proposed segment have a substantial utility independent of future expansion?

2. Would its construction foreclose significant alternative routes or locations for an extension from the segment?

3. If, as here, the proposed segment is part of a larger plan, has that plan become concrete enough to make it highly probable that the entire plan will be carried out in the near future?

The answers to these questions in the instant case require us to hold that the EIS must cover the entire 42-mile freeway.

In this case, the proposed 15-mile segment would have no utility independent of the connection of I–74 between Peoria and Morton in the north. The northern terminus of this segment is near no major crossroad, population center or traffic generator or similar major highway control element as specified in Section 3(a) of PPM 90–1 (note 2 *supra*). The northern terminus ends in the country at no logical or major terminus. Unlike the district court, we cannot consider the 3½ mile completed segment as a "major highway control element" and therefore a logical terminal within the regulation, for its south and north ends are merely nearby points in the country.

Second, the history of this project indicates that building the southern section would effectively limit choices for building the northern part. The routing of this segment was chosen to meet the 3½ mile completed segment of the northern component of FAP 406. Obviously, the location of the northern component will be determined because of the placement of the southern component, thus tainting any separate environmental evaluation of the northern component.

Third, the southern component is part of a firm 42-mile supplemental freeway. The United States has advised us that "Another project [the remaining northern component of FAP 406] is underway to connect that [3½ mile] completed freeway [3] to Interstate 74 near Morton [in the Peoria area], Illinois," and that a draft EIS for that project has been approved and adopted by the Federal Highway Administration. The Government concedes that the 15-mile segment under review here "is a part of a highway which will eventually connect I–55 [at Lincoln] with I–74 [at Peoria]" (Government Br. 16–17). Federal funding has been or will be sought for all of the 42-mile supplemental freeway. Therefore, it is clear that all of FAP 406 is an ongoing project which constitutes the " 'federal action' being tak-

en" under *SCRAP II* (422 U.S. at 322, 95 S.Ct. 2336) or the "proposed action" under NEPA. The two components are really one enterprise.

■ While, as seen, FAP 406 is part of an overall 1800-mile trunk system of interstate highways and supplemental freeways designed to connect every Illinois city of over 25,000 population, we agree with the Eighth Circuit in *Indian Lookout Alliance* that the overall project is not subject at the outset to the requirements of NEPA. Such plans are still visionary and subject to revision. 484 F.2d at 18–19. However, the 42-mile stretch of FAP 406 is a sufficiently final proposal to require an EIS under NEPA and PPM 90–1, *supra*. See *SCRAP II*, 422 U.S. at 320, 95 S.Ct. 2336; *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra*, 531 F.2d at 639; *Named Individual Members of San Antonio Conservation Society v. Texas Highway Dept., supra*, 446 F.2d at 1023–1024 (5th Cir. 1971).[4]

■ Although we have been advised that another EIS has been prepared with respect to the northerly component of FAP 406, its contents are not in this record. It is no answer to say that together the two make up for any deficiency in the present EIS, for the combined statements of course do not consider the overall environmental effects of the 42-mile freeway.

It is thus apparent that the scope of the proposed federal action is the funding of a highway connecting Interstate 55 near Lincoln in the south with Interstate 74 near Peoria in the north. Since the potential environmental impacts of the two components are interrelated, they must be evaluated together. This will not place a great burden on the draftsmen of the new EIS, for most of the work has been done in preparing the separate statements. All that is needed is a supplement to this EIS

---

3. This refers to the completed southern stretch of the northerly component of FAP 406.

4. See also our earlier opinion. 517 F.2d at 776, n.12. *Daly v. Volpe, supra*, 514 F.2d at 1111, is

not to the contrary, for the challenged segment had independent utility and met various criteria set out in PPM 90–1, *supra*.

to consider the overall environmental effect of the proposed 42-mile freeway.

Judgment reversed and cause remanded to the district court with directions to retain jurisdiction pending submission of a proper EIS by the Federal Highway Administration. Upon submission of that EIS, the district court shall make such further order as it deems appropriate, consistent with this opinion.

SWYGERT, Circuit Judge (concurring).

In this court's earlier opinion, *Swain v. Brinegar*, 517 F.2d 766 (7th Cir. 1975), the majority indicated its disagreement with the district court's holding that inquiries directed at chemical pollution, alternative modes of transportation, and the effect of removal of farmland from production were questions that have a general significance that extends far beyond the limited project envisioned here. Noting that one of the fundamental purposes of NEPA is to require consideration of such questions of general or broad significance, the court stated that NEPA expressly requires recognition of "the worldwide and long-range character of environmental problems," 42 U.S.C. § 4332(2)(E), "the relationship between the local short-term uses of man's environment and maintenance and enhancement of long-term productivity," 42 U.S.C. § 4332(2)(C), the fact that each "limited" federal project is part of a large mosaic of thousands of similar projects, and the need to consider cumulative effects in an environmental impact statement (EIS). The court also pointed out that the EIS prepared by the state defendants did not cover a logical length of highway, which in this case would have been the entire Lincoln-Peoria freeway.

Today this court, sitting *en banc*, has determined that the EIS prepared for the suit project is insufficient insofar as it con-

siders less than the entire forty-two mile segment of FAP 406 which constitutes the proposed federal action being taken in this case. In reaching this holding the court has set forth standards which not only provide a basis for determining the scope of a proposed federal action and its accompanying EIS, but which also strike a balance between the express requirements of the National Environmental Policy Act, 42 U.S.C. §§ 4321, *et seq.* (NEPA), and the practical implementation of those requirements. Because I am convinced that much of the insufficiency of the EIS noted in this court's earlier opinion will be cured by our holding today requiring defendants to prepare an EIS for the entire forty-two mile segment of FAP 406, I concur in the result reached in this case and fully endorse the standards set forth in the majority opinion.

I am skeptical, however, of the procedures which the majority opinion authorizes defendants to follow in preparing a new EIS. In considering the effect of the enactment of Public Law 94–83, 42 U.S.C. § 4332(2)(D), on this court's earlier opinion, the majority opinion holds that the decision of the original panel can no longer stand in the light of the NEPA amendment. Supporting this holding the majority opinion contains conclusory statements concerning the contents of the record and cites the Second Circuit's recent opinion in *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 531 F.2d 637 (2d Cir. 1976).[1] Because a review of the record convinces me that this holding sanctions conduct by the federal defendants which on the basis of the present record, fails to comply with the express requirements of NEPA, I am, unfortunately, unable to agree with this portion of the court's opinion and suggest that the federal defendants' failure to comply with the statutory requirements in Public Law 94–83 be

1. The majority states:

The record reveals that the draft and final statements were adequately reviewed by the Federal Highway Administration (FHWA) and that it furnished sufficient guidance to the state. The federal participation was not limited to the FHWA, for the appendix to the

EIS discloses that the document was considered by each federal agency with an interest in the matter. Most importantly, the FHWA complied with the purposes of NEPA, as amended, by accepting and exercising final authority for the evaluation of the environmental impact of the proposal.

an additional ground for invalidating the EIS before us.[2]

The passage of Public Law 94–83 in and of itself does not require a finding of proper delegation of responsibility by the appropriate federal official to a state agency for the preparation of an EIS.[3] As noted by the majority opinion, Congress conditioned federal delegation of responsibility for the preparation of an EIS on criteria which would require not only the federal official's guidance and participation in the preparation of an EIS but also his independent evaluation of such statement prior to its approval and adoption. Thus, by the passage of Public Law 94–83, Congress did not intend to relieve the federal official "of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility" under NEPA. Public Law 94–83, 42 U.S.C. § 4332(2)(D).

The legislative history of Public Law 94–83 serves only to reinforce the statute's plain language:

> [The bill] does not sanction a "rubber stamp" approach to Federal responsibilities, nor does it allow Federal functionaries to sidestep the other responsibilities placed upon them by law including, but

not limited to, NEPA. What it does is to encourage adequate inputs of information, and to ensure that a continuing federal presence is mandated to fit that information into a rational and realistic planning and decision-making process. If enacted, H.R. 3130 would have this, *and only this* effect. (H.R.Rep.No.144) 94th Cong., 1st Sess. (1975). (Emphasis in original.) U.S.Code Cong. & Admin. News 1975, p. 867.

Keeping in mind the statutory requirements of significant guidance and participation in the preparation of an EIS and independent evaluation by the responsible federal official, a review of the record in this case demonstrates that the federal defendants failed to fulfill their responsibilities under NEPA. In particular, both the administrative record and the district court's decision and order reveal a complete lack of federal agency input in the preparation of the draft EIS and little more than a "rubber stamp" on the final draft.

*Preparation of the Draft EIS*

Although the majority opinion states that the record reveals that FHWA "furnished sufficient guidance to the state," the evidence is meager at best to support a holding

---

**2.** Were the federal defendants' noncompliance with Public Law 94–83 the only ground raised by plaintiffs for reversing the district court's judgment, a remand to the district court for further evidence on this issue might be appropriate. In light of the majority's holding, however, it would not be in the interest of judicial economy to require further development of the present record since even if defendants were able to present evidence showing compliance with the statute, such a showing would not cure the insufficient scope of the EIS.

**3.** Public Law 94–83 provides:

(D) Any detailed statement required under subparagraph (C) after January 1, 1970, for any major Federal action funded under a program of grants to States shall not be deemed to be legally insufficient solely by reason of having been prepared by a State agency or official, if:

(i) the State agency or official has statewide jurisdiction and has the responsibility for such action,

(ii) the responsible Federal official furnishes guidance and participates in such preparation.

(iii) the responsible Federal official independently evaluates such statement prior to its approval and adoption, and

(iv) after January 1, 1976, the responsible Federal official provides early notification to, and solicits the views of, any other State or any Federal land management entity of any action or any alternative thereto which may have significant impacts upon such State or affected Federal land management entity and, if there is any disagreement on such impacts, prepares a written assessment of such impacts and views for incorporation into such detailed statement.

The procedures in this subparagraph shall not relieve the Federal official of his responsibilities for the scope, objectivity, and content of the entire statement or of any other responsibility under this chapter; and further, this subparagraph does not affect the legal sufficiency of statements prepared by State agencies with less than statewide jurisdiction.

that the federal defendants complied with Public Law 94–83 by providing the state with significant guidance and participation in the preparation of the EIS. It is not surprising, then, that the district court's decision contains no findings of fact or conclusions of law regarding this aspect of the federal defendants' conduct.

Congress made clear that "[t]he involvement of the Federal official should come early and at every critical stage in the preparation of the EIS, and should be substantial and continuous." S.Rep.No.152, 94th Cong., 1st Sess. (1975), U.S.Code Cong. & Admin.News 1975, p. 868. Thus, the fact that the federal official may ultimately evaluate a state-prepared EIS in no way abrogates the official's statutory duty to offer significant guidance and participation in the preparation of the statement at its early stages of development. The responsibilities imposed on the federal official by Public Law 94–83 are mandatory and inclusive. Anything less than full compliance with the procedural requirements of the NEPA amendment renders the federal official's delegation of responsibility improper and requires the preparation of a new EIS. There being no evidence in the present record indicating that FHWA or any of its employees assumed a meaningful role in the preparation of the EIS, one which could result in a significant contribution of ideas, the EIS before us is insufficient for its failure to comply with NEPA requirements.

*Evaluations of the EIS*

There is an abundance of evidence in the record to demonstrate that the federal defendants did little more than "rubber stamp" the state-prepared EIS. The district court's conclusions regarding the federal defendants' review of the EIS fall short of satisfying NEPA's requirement of independent evaluation of the EIS by the responsible federal official. In response to plaintiffs' claims that the FHWA failed to thoroughly review the EIS after its preparation by the state defendants, the district court noted:

Correspondence between state and federal officials following preparation of the draft EIS, reveals that representatives of the FHWA made thoughtful comments on aspects of the highway project which indicate that they seriously studied the statement. Among other things, they remarked on the loss of 750 acres of farmland and suggested that the EIS discuss the corridor alternates which were considered. The fact that the final EIS was approved without change is not surprising, in that the FHWA *presumably* voiced all of its criticisms prior to the preparation of the final EIS. 378 F.Supp. 753, 761 (S.D.Ill.1974). (Emphasis added.)

Conduct "presumably" performed by a federal agency can hardly satisfy an express statutory requirement. The record indicates that the comments and criticisms voiced by FHWA officials prior to the preparation of the final EIS were, in large part, brief and insignificant. Many of the comments dealt with the form of the EIS and others were plainly labeled "minor comments." The comments made by federal officials in response to the final EIS demonstrate a similar lack of serious independent analysis. This is exemplified by one comment which stated, "We agree with the State's evaluation and disposition of environmental comments as reflected in the final statement."

The absence of comments by federal officials is also particularly noteworthy. After commenting on the need for the EIS to consider the loss of seven hundred acres of farmland as an adverse effect of the suit project, federal officials approved the final EIS which merely added the following two sentences:

When considering adverse effects, one that should not be overlooked is the loss of over 700 acres of tillable land. This change in land use brings about many side effects that are never fully noted.

As stated in this court's earlier opinion, there was no indication in the final EIS as to what these side effects might be. Thus, it is clear that the federal defendants did

little more than offer superficial review of the EIS and did not even bother to make sure that the state officials gave meaningful consideration, much less in-depth analysis, to their few substantive suggestions.

The lack of independent evaluation by the federal defendants is further exemplified by the "detailed discussion" contained in Section VI of the EIS. In the state draft this section, in its entirety, read as follows:

### Section VI—Any Irretrievable or Irreversible Commitments of Natural Resources

F.A.P. 406 from Lincoln to Delavan will entail the commitment of natural resources for the construction materials of the project and the diversion of farmland from agricultural production.

The raw materials of highway construction are in plentiful supply, and their commitment should cause no serious concern for long-term allocation of resources. The farmland diverted may be another problem.

Approximately 750 acres would be diverted from agricultural uses. This acreage loss is not considered significant, though, when taking into account the large number of people that the Freeway will serve and the benefits and added safety that will be derived from it.

Because of the influence of the human ecosystem, the natural resources of the environment become a trade-off item, succumbing to the desires of a mobile society. These trade-offs are necessary for the accommodation of mankind.

The final version of this section merely deleted the final paragraph and slightly altered the word sequence of the third paragraph. Similarly, Section V, entitled, "The Relationship between Short Term Uses of Man's Environment and the Maintenance and Enhancement of Long Term Productivity," originally four and one-half pages in length, appeared in the final EIS without any change whatsoever.

In light of the above, to conclude as did the district court that the FHWA "seriously studied" the EIS is to exalt form over substance and render the statutory requirements of Public Law 94–83 meaningless. Because of the meager record before us and the fact that the final EIS, prepared after review by the federal defendants, was identical to the original state-prepared draft with a few superficial changes and deletions, I am unable to agree with the majority opinion that the draft and final statements were "adequately reviewed" by the FHWA or that "the FHWA complied with the purposes of NEPA, as amended, by accepting and exercising final authority for the evaluation of the environmental impact of the proposal."

Nor do I agree with the majority opinion that *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra,* supports a conclusion that the requirements of Public Law 94–83 have been met. In that case, on remand from the United States Supreme Court, the Second Circuit reconsidered its prior ruling affirming a district court judgment which held that the delegation of authority for the preparation of an EIS by a responsible federal agency to a state agency rendered the state-prepared EIS insufficient under NEPA. 362 F.Supp. 627 (D.Vt.1973), *aff'd,* 508 F.2d 927 (2d Cir. 1974). In examining the question of whether the state-prepared EIS complied with the requirements of NEPA as amended by Public Law 94–83, the Second Circuit held that the findings of the district court indicated that the conduct of the responsible federal official in the preparation and evaluation of the EIS constituted compliance with the procedural requirements of the NEPA amendment.

Specifically, the court noted that the district court found that "the appropriate federal official 'maintained frequent contact' with the state officials" and "was in verbal communication two or three times weekly with the state official primarily responsible for the preparation of the EIS." The court also pointed out that the "FHWA division engineer undertook a field trip to examine the proposed route, during which environmental considerations were noted and discussed." In addition the record indicated

that the state agency prepared the EIS "in consultation with FHWA." *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation*, 531 F.2d at 639. Although the propriety of the Second Circuit's holding is seriously challenged by the legislative history of Public Law 94–83, as pointed out in an articulate opinion by Judge Adams, dissenting in part,[4] it is sufficient for purposes of the instant case merely to note that the record before the court in *Conservation Society* provides more evidence to support a finding of compliance with the requirements of Public Law 94–83 than does the record before us here. Thus, the Second Circuit's analysis of Public Law 94–83 supports the conclusion that the conduct of the federal defendants in the present case failed to satisfy the NEPA amendment.

Because of our holding today which requires the preparation of a new EIS for the entire forty-two mile segment of FAP 406, the importance of the procedures by which the EIS is prepared and reviewed cannot be overemphasized. Both the language of Public Law 94–83 and its legislative history indicate that Congress intended for the responsible federal official to retain a substantial, though not exclusive, role in the development of the EIS. As stated by Judge Adams in *Conservation Society of Southern Vermont, Inc. v. Secretary of Transportation, supra:*

By Public Law 94–83, Congress has now acted to allow the state agency to prepare the EIS under certain circumstances. But it has imposed a strict requirement of federal control in the process. The federal agency, according to the Congressional mandate, must guide the state agency during the preparation of the

EIS. The federal agency must actively participate in that preparation. And the federal agency must review and evaluate the EIS independently, meeting its own responsibility to be fully accountable for the environmental ramifications of the proposed project. These are not duties that are fulfilled easily, or without substantial effort, input, and understanding. Congress has rejected the idea that the federal agency must perform all the work involved in preparing the EIS, but it has reaffirmed the principle that ultimate control must rest in federal hands. 531 F.2d at 644.

Convinced that the federal defendants failed to provide the state either significant guidance and participation in the preparation of the EIS or a meaningful and independent review of the state-prepared statement, I am unable to conclude that the standard of federal involvement mandated by Public Law 94–83 has been met in this case. Therefore, I regretfully disagree with that portion of the majority opinion which concludes that the federal defendants complied with the procedural requirements of Public Law 94–83. However, I fully concur in the remaining portion of the majority opinion.

TONE, Circuit Judge, with whom PELL and BAUER, Circuit Judges, join (dissenting).

I agree with the majority opinion except in its holding that it was improper to confine the environmental impact statement to the 15-mile segment in issue. It is important, to begin with, to understand the geography, which is shown by the following schematic map:

---

4. For an excellent analysis of the legislative history of Public Law 94–83, *see* Judge Adams' opinion, dissenting in part, in *Conservation So-* *ciety of Southern Vermont, Inc. v. Secretary of Transportation*, 531 F.2d at 640–644.

The section of freeway marked "B" has already been built. Part of it was completed in the 1960's long before the adoption of the National Environmental Policy Act and the remainder was completed in 1972 or 1973. The construction of this section is not claimed to have been unlawful. Its cost was over $7,100,000.

If it were not for the existence of section "B," I would agree with the majority that the proposed federal action, determined in the light of the Federal Highway Administration's Policy and Procedure Memorandum (PPM) 90–1, is the entire 42 miles of freeway between Peoria and Lincoln. But section "B" does exist, and no one suggests that it will not be utilized, whatever route is selected for the freeway between Peoria and Lincoln. The only alternative, unless the freeway connecting those cities is not to be built, would be to duplicate elsewhere that 3½-mile section of freeway. No one has suggested that it would be advanta-

geous to the environment or rational for any other reason to build another 3½-mile section of freeway which would as a matter of geographical necessity be near section "B," which would leave section "B" an unused expanse of concrete, and which would cost $7,100,000 plus the amount that building costs have increased since section "B" was built.

Thus, if a freeway is to be built between Peoria and Lincoln, section "B" will obviously be a part of that freeway. The Federal Highway Administration's determination that section "B" was a "major highway control element" within the meaning of its own PPM 90–1, § 3(a) (quoted in the majority opinion, note 2) was a reasonable application of its own regulations and one to which the usual deference is due. *Cf. Northern Indiana Public Service Co. v. Porter County Chapter of Izaak Walton League*, 423 U.S. 12, 14–15, 96 S.Ct. 172, 173–174, 46 L.Ed.2d 156 (1975). In my

opinion, the District Court was correct in sustaining this interpretation, and the majority of this court has not applied the principle it correctly recognizes when it says:

"The task of the court is not to decide where to draw the line, but to review the matter to ascertain whether the agency has made a reasonable choice."

To complete the statement of my position, I should also explain what is perhaps obvious, *viz.*, why I have not thought it realistic to assume that an environmental impact statement covering the entire freeway between Peoria and Lincoln might lead the responsible authorities to conclude that such a freeway should not be built at all. The majority holds sufficient the EIS for the 15-mile segment on which this action focuses (section "C" on the above sketch), noting:

"In the EIS, the need for a new road was specifically explained on the basis of the growth in traffic and the expansion of the communities to be served by the highway."

As the passage in the EIS referred to makes clear, the need considered is the need for a freeway between Peoria and Lincoln as a segment of a freeway between Peoria and Springfield. The estimated traffic growth is based on the assumption, the EIS states, that the Peoria-Lincoln segment would be "built in its entirety." If the need for 42 miles of freeway justifies taking the 700 acres of farmland necessary for the 15-mile southern portion (section "C") of those 42 miles, as the planners have concluded it does, it is hardly conceivable that the same need will not be found to justify taking the additional acreage necessary for the northern portion (section "A"). Environmental considerations related to section "A" other than loss of farmland may affect the routing and manner of constructing that section, but cannot realistically be viewed as potential bars to the construction of that section at all.

---

* This appeal was originally decided by unreported order on August 27, 1976. See Circuit Rule 35 (formerly Circuit Rule 28). The court has

Accordingly, I believe the agency did not misinterpret its own regulations or the National Environmental Policy Act in determining that in the unusual circumstances of this case the 15-mile section was the appropriate subject of a separate environmental impact statement. I would therefore affirm the judgment.