**FUTUREX INDUSTRIES, INC. and James E. Redden, Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents,**
**and**
**CSX Transportation, Inc., Intervening Respondent.**

**Nos. 88–3113 & 89–2565.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 27, 1989.

Decided March 5, 1990.

As Amended on Denial of Rehearing and Rehearing En Banc April 18, 1990.

Gordon P. MacDougall, Washington, D.C., George C. Moravcik, St. Charles, Ill., for petitioners.

Dennis J. Starks, Robert S. Burk, Office of the General Counsel, Washington, D.C., William Redmond, Chicago, Ill., Louis Mackall, Interstate Commerce Com'n, Edwin Meese, U.S. Atty. Gen., Dept. of Justice, Civ. Div., Appellate Section, Washington, D.C., Lawrence H. Richmond, Baltimore, Md., Anton R. Valukas, U.S. Atty., Office of the U.S. Atty., Chicago, Ill., Catherine G. O'Sullivan, David Seidman, Dept. of Justice, Antitrust Div., Appellate Section, Washington, D.C., Richard L. Thornburg, U.S. Atty. Gen., Office of the U.S. Atty. Gen., Washington, D.C., for respondents.

Lawrence H. Richmond, Peter J. Shudtz, Baltimore, Md., Charles M. Rosenberger, Patricia Vail, Jacksonville, Fla., for intervening respondent.

Before CUDAHY and POSNER, Circuit Judges, and FAIRCHILD, Senior Circuit Judge.

CUDAHY, Circuit Judge.

Railroad carriers seeking to abandon rail segments customarily must apply to the Interstate Commerce Commission (the "ICC" or the "Commission") for a certificate of abandonment or discontinuance. The ICC then balances a number of factors to determine whether "the present or future public convenience and necessity" will be served by an abandonment or discontinuance of service. 49 U.S.C. § 10903(a) (West Supp.1989). A carrier may circumvent this process, however, if it seeks to abandon an "out-of-service" segment; such abandonments are exempt from the provisions of 49 U.S.C. sections 10903 to 10905 if certain criteria are met.[1]

Relying upon the out-of-service class exemption, CSX Transportation ("CSXT") has attempted to abandon a 14.58–mile segment of track. Futurex Industries ("Futurex") and the United Transportation Union (the "UTU") object to the action, arguing that abandonment would lead to higher costs and delayed service for rail shipments. The Commission refused to revoke CSXT's exemption permitting abandonment; Futurex and the UTU appeal from that final decision.

## I.

CSXT operates rail systems in the eastern and middle regions of the United States. CSXT's Decatur Subdivision runs between Decatur, Illinois and Indianapolis,

---

**1.** 49 U.S.C. section 10505(a) directs the ICC to exempt a rail transaction that

 (1) is not necessary to carry out the transportation policy of section 10101a of this title; and

 (2) either (A) the transaction or service is of limited scope, or (B) the application of a provision of this subtitle is not needed to protect shippers from the abuse of market power.

49 U.S.C. § 10505(a) (West Supp.1989). Under this authority, the ICC issued a class exemption to railroads seeking to abandon segments that did not generate local traffic for two years ("out-of-service") and that could reroute "overhead traffic"—traffic that does not originate or terminate on the line segment—over other lines.

49 C.F.R. § 1152.50 (1988). *See Exemption of Out of Service Rail Lines*, 366 I.C.C. 885 (1983) and 1 I.C.C.2d 55 (1984), *remanded, Illinois Commerce Comm'n v. ICC*, 787 F.2d 616 (D.C. Cir.1986); *Exemption of Out of Service Rail Lines*, 2 I.C.C.2d 146 (1986), *aff'd, Illinois Commerce Comm'n v. ICC,* 848 F.2d 1246 (D.C.Cir. 1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989).

 For a comprehensive discussion of the abandonment process and the framework of the Staggers Rail Act of 1980, Pub.L. No. 96–448, 94 Stat. 1895 (1980) (codified in scattered sections of 49 U.S.C.), see *Illinois Commerce Comm'n v. ICC,* 787 F.2d at 621–22.

Indiana. Within this subdivision—between Bloomingdale and Russellville, Indiana—lies the 14.58–mile segment at issue in this case. *See* Appendix.

In early 1987, CSXT discontinued its Decatur to Indianapolis train and instituted a connecting service for this traffic at West Dana, Illinois. CSXT continued to reroute overhead cars onto existing high density main lines, however, due to the dwindling volume of traffic moving from West Dana to Indianapolis: as a result, the Indianapolis–Russellville segment was served from Indianapolis, while the Bloomingdale–Hillsdale segment was served from the west. Since no overhead or local traffic travelled the 14.58–mile segment between Bloomingdale and Russellville after these changes took place, CSXT notified state and federal agencies that it would be filing a Notice of Exemption to abandon the segment. On November 23, 1987, CSXT filed its Notice of Exemption with the ICC pursuant to 49 C.F.R. section 1152.50(d) (1988). As required by 49 C.F.R. section 1152.50(b), CSXT certified that

> (1) no local traffic has moved over the line for at least two years prior to the date hereof; (2) overhead traffic on the line has been rerouted over other lines; and (c) [sic] no formal complaint filed by a user of rail service on the line (or state or local governmental agency acting on behalf of such user) regarding cessation of service over the line is either pending with the Commission or any U.S. District Court or has been decided in favor of a complainant within the two-year period prior to the date hereof.

CSXT's Notice of Exemption, Exhibit A (Nov. 20, 1987). The ICC gave public notice of the proposed abandonment, declaring that the exemption would become effective January 9, 1988, unless the ICC stayed the proceedings pending reconsideration. 52 Fed.Reg. 46855 (Dec. 10, 1987).

Futurex and the UTU filed timely objections to the proposed abandonment. Specifically, Futurex and the UTU requested a stay and a revocation of exemption under 49 U.S.C. section 10505(d), which provides: "The Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class, or transportation is necessary to carry out the transportation policy of section 10101a of this title." 49 U.S.C. § 10505(d).

Futurex has plastic sheet extrusion plants at Bloomingdale and Marshall, Indiana. Futurex's Bloomingdale plant, which received forty railroad cars in 1987, is situated on the Bloomingdale–Hillsdale segment, while its Marshall plant, which did not receive any cars in the two years prior to the filing, is situated on the Russellville–Bloomingdale segment at issue in this case. Futurex claimed to the Commission that CSXT's abandonment of the 14.-58–mile segment is only one part of a more comprehensive plan to abandon the entire Decatur subdivision. Futurex argued further that the abandonment of the Russellville–Bloomingdale "middle" segment in particular—and the abandonment of the entire subdivision in general—would lead to higher costs, poorer service and inefficient rerouting of overhead traffic.

The Commission denied Futurex's and UTU's requests for a stay, but the agency stayed operation of the exemption on its own motion pending an independent review of the environmental impact of the proposed abandonment. After conducting this review, the Commission lifted its stay on September 14, 1988, concluding that the environment would not be adversely affected by the proposed abandonment. The Commission also rejected Futurex's arguments that it should stay the abandonment because of Futurex's anticipated business growth; it reasoned that the Marshall plant had not originated or terminated a carload on the segment for at least two years, and that CSXT should not be compelled "to continue to incur the expense of maintaining this line on the strength of the unsupported possibility that Futurex might tender some traffic on the line at some time in the future." *CSX Transportation, Inc.—Exemption—Abandonment in Putnam and Parke Counties, IN,* at 4 (ICC Docket No. AB–55 (Sub–No. 222X)) (Sept. 14, 1988). Moreover, the Commission noted that the proposed abandonment would

not affect rail service to Futurex's Bloomingdale plant, and that "Futurex can participate in any future abandonment proceedings which may affect service to that facility." *Id.* Finally, the Commission repeated that routing decisions are typically within the railroad's managerial discretion, and that CSXT's alternate routes for rerouted traffic were generally as efficient as the old routes via the Bloomingdale to Russellville segment.

Futurex and the UTU petitioned the Commission for a stay and for a reopening of its decision. The petition pointed to new evidence—CSXT's listing of the 42.79–mile Indianapolis–Russellville segment on its System Diagram Map ("SDM") in Category 1—not considered in the Commission's September decision. Since, according to the petition, it was now clear "that CSXT intend[ed] to seek abandonment of the entire line between Indianapolis and the Illinois/Indiana border," the Commission's review should have considered the environmental and economic effects of abandoning the entire line, not simply the 14.58–mile segment. Petition to Reopen at 3. Again the Commission refused to stay or reopen its decision, concluding that it properly confined its environmental and economic analysis to the proposed abandonment. *CSX Transportation, Inc.—Exemption—Abandonment in Putnam and Parke Counties, IN* (ICC Docket No. AB–55 (Sub–No. 222X)) (Oct. 27, 1988). This decision was later affirmed. *CSX Transportation, Inc.—Exemption—Abandonment in Putnam and Parke Counties, IN* (ICC Docket No. AB–55 (Sub–No. 222X)) (June 7, 1989) (denying petition to reopen). Futurex and James E. Redden, the Indiana Legislative Director for the UTU, appeal from the ICC's September 20 decision; we have jurisdiction to review the ICC's final order. 28 U.S.C. § 2321(a) (1982); 28 U.S.C. § 2342(5) (West Supp.1989); 49 U.S.C. § 10327(i) (West Supp.1989).

## II.

At the outset, we pause to note that the scope of our review of ICC decisions is narrow. *Bloomer Shippers Ass'n v. ICC,* 679 F.2d 668, 672 (7th Cir.1982). We examine these decisions to determine whether they are supported by substantial evidence and are not arbitrary or capricious. 5 U.S.C. § 706 (1982); *see Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.,* 419 U.S. 281, 284, 95 S.Ct. 438, 441, 42 L.Ed.2d 447 (1974); *Illinois Commerce Comm'n v. ICC,* 848 F.2d 1246, 1250 (D.C. Cir.1988), *cert. denied,* —— U.S. ——, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989); *Illinois v. ICC,* 698 F.2d 868, 871 (7th Cir.1983). And our review of Commission decisions in abandonment cases has been even more deferential. *Indiana Sugars, Inc. v. ICC,* 694 F.2d 1098, 1100 (7th Cir.1982) ("The normal deference accorded by courts to the Commission expertise is probably intensified to some extent in abandonment cases by the trend of Congressional policy.").

Our decisions in this area of law focus, for the most part, on customary abandonment procedures: a carrier must demonstrate to the ICC that "the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. § 10903(a); *see, e.g., Simmons v. ICC,* 784 F.2d 242, 246–48 (7th Cir.1985); *Indiana Sugars,* 694 F.2d at 1099. Further, the Commission must weigh "[t]he interests of the public in continued service and of the carrier in avoiding financial loss." *Indiana Sugars,* 694 F.2d at 1100; *see Colorado v. United States,* 271 U.S. 153, 168–69, 46 S.Ct. 452, 456, 70 L.Ed. 878 (1926). The Commission (pursuant to Congress's authorization) has already struck this balance, however, by issuing a class exemption to out-of-service lines like the Bloomingdale–Russellville segment.[2] The abandonment is therefore presumptively valid; in order to overcome this presumption, Futurex and the UTU must show that the Commission has abused its discretion in refusing to revoke CSXT's exemption.

To make this showing, Futurex and the UTU first allege that CSXT did not properly invoke the out-of-service class exemption

---

2. *See supra* note 1.

for the Bloomingdale–Russellville segment. CSXT notes that no local traffic traversed the 14.58–mile segment during the two-year period prior to the filing date, nor had there been any formal complaint pending with the ICC or a district court within that period. Moreover, CSXT argues that it rerouted the overhead traffic to other lines, preserving the existing transit times for at least ninety-five percent of the traffic. These steps, if supported by the factual record, would qualify the segment for the out-of-service class exemption. *See* 49 C.F.R. § 1152.50(d) (1988). And this exemption has been upheld as a proper subject of agency regulation under 49 U.S.C. section 10505 (1982). *Illinois Commerce Comm'n v. ICC*, 848 F.2d 1246 (D.C.Cir. 1988), *cert. denied*, — U.S. —, 109 S.Ct. 783, 102 L.Ed.2d 775 (1989).

Futurex's and the UTU's challenge, however, is not limited to the conclusions reached by the Commission. Futurex and the UTU challenge the ICC's *methodology* in determining whether the Bloomingdale–Russellville segment satisfies the requirements of the out-of-service class exemption. Specifically, they argue that the Commission's findings were unreasonable and insufficient to support its decision because the Commission considered only the environmental and economic impact caused by CSXT's abandonment of the 14.58–mile Bloomingdale–Russellville segment, instead of examining the likely abandonment of the entire 66.25–mile Indianapolis–Hillsdale line. We address this issue first.

#### A. Segmentation: The Scope of the ICC's Analysis

 Futurex contends that the Bloomingdale–Russellville abandonment is merely one stage of a comprehensive abandonment of CSXT's 66.25–mile mainline between Indianapolis and Hillsdale. Indeed, CSXT's actions seem to confirm this: CSXT filed a Notice of Intent on June 2, 1988, to abandon the mainline's 8.58–mile western segment between Bloomingdale and Hillsdale. And five days later, CSXT placed the 42.-79–mile eastern segment between Indianapolis and Russellville on its SDM in Category 1.[3] The ICC refused to consider these actions in its denial of Futurex's Petition to Reopen, reasoning:

> Since CSXT sought to abandon its line between Russellville and Bloomingdale, this is the only proceeding before us at this time regardless of any future intent by CSXT to abandon any other segment within its operation. Claims that a particular abandonment may be a "first step" for other abandonments are generally not material in abandonment proceedings since we decide each case on its own facts.

*CSX Transportation, Inc.—Exemption—Abandonment in Putnam and Parke Counties, IN*, at 2 (ICC Docket No. AB–55 (Sub–No. 222X)) (June 7, 1989). Futurex objects to the Commission's characterization of CSXT's actions as a *"future intent"* to abandon another segment; we agree with Futurex that the listing of a segment in Category 1 is more properly characterized as a *present intent* to abandon at some time in the future.[4] *See Illinois v. ICC*, 615 F.2d 743, 749 n. 12 (7th Cir.1979) (noting correlation between placement of line on SDM and present intent to abandon). But this semantic dispute need not detain us long. The predominant issue to be resolved is whether the Commission properly examined only the environmental and economic impact caused by CSXT's

---

**3.** Federal regulations on abandonment require rail carriers to prepare SDMs designating lines on their systems by certain categories described in 49 C.F.R. section 1152.10. Thus, CSXT—by designating the eastern segment as a Category 1 line—has certified that it "anticipates [that the line] will be the subject of an abandonment or discontinuance application to be filed within the 3–year period following the date upon which the diagram, or any amended diagram, is filed with the Commission. . . ." 49 C.F.R. § 1152.10(b)(1) (1988).

**4.** The ICC disputes this conclusion, arguing that "[t]he fact that the carrier has identified [on the SDM] a line segment as a prospective candidate for abandonment does not necessarily mean that it will decide to carry through with an abandonment proposal." Respondent's Brief at 12 n. 12. But the ICC's argument here proves too much: a carrier can *always* decide not to abandon, even after receiving ICC approval or exemption.

abandonment of the 14.58–mile middle segment, or whether the Commission should have considered the larger effects caused by the likely abandonment of the entire 66.25–mile mainline.

This is not a question of first impression in our circuit. In *Illinois v. ICC*, 615 F.2d 743 (7th Cir.1979), we considered whether the ICC properly examined the impact of a segment's abandonment on an adjacent segment. There, the Illinois Central Gulf Railroad Company (the "ICG") filed an application to abandon a 42–mile segment of track, but then amended the application, proposing that only the northernmost 26.5 miles be abandoned. We upheld the amendment and, at the same time, concluded that the ICC was not required to consider the impact of the abandonment in conjunction with the *potential* abandonment of the southern segment:

> To require the ICC to specially consider the effect of this abandonment on a proposed future abandonment of a neighboring segment would be inconsistent with ICC precedent, *Southern Pacific Transportation Company Abandonment*, 360 I.C.C. 138, 141 (1979); *Chicago & North Western Railway Company Abandonment*, 295 I.C.C. 31, 38–39 (1955); ... *cf. American Trucking Associations, Inc. v. United States*, 326 U.S. 77, 82–83 [65 S.Ct. 1499, 1501–02, 89 L.Ed. 2065] (1945), and something this court will not do.

*Illinois v. ICC*, 615 F.2d at 749. To be sure, that case is not entirely analogous: whether the ICG intended to abandon the southern segment there is certainly less clear than CSXT's intent here to abandon the remainder of the lines adjacent to the Bloomingdale–Russellville segment. But *Illinois v. ICC* does reflect our hesitancy up to this time to require the Commission to engage in a comprehensive study of environmental and economic effects occurring because of *potential* abandonments in adjacent segments. This is not to suggest that the ICC may properly examine only those effects that occur on the abandoned section; it must also assess the damage (due to the abandonment) occurring on neighboring segments as they currently exist. *See, e.g., Swain v. Brinegar*, 542 F.2d 364, 367, 370 (7th Cir.1976) (en banc). But it does not necessarily need to consider all the effects of *potential* abandonments of neighboring segments on the entire mainline at the time the first segment is abandoned.

This approach is consistent with the Supreme Court's seminal decision in *Kleppe v. Sierra Club*, 427 U.S. 390, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976). There, the Department of the Interior had approved certain coal-related operations without preparing a comprehensive environmental impact statement for the entire region. The Court held that the agency's issuance of environmental impact statements for each component part of the operation (but not for the entire region) was an appropriate exercise of its discretion. *Id.* at 408–15, 96 S.Ct. at 2729–33. *See City of West Chicago, Ill. v. United States Nuclear Regulatory Comm'n*, 701 F.2d 632, 650–51 (7th Cir.1983).

The analysis supporting these decisions is *not* simply that an agency may confine its examination of the environmental and economic consequences of abandonment to discrete segments. On the contrary, courts have recognized that, in the context of segmentation, the sum of a unit's parts may not equal its whole. *Kleppe v. Sierra Club*, 427 U.S. at 410, 96 S.Ct. at 2730 ("[W]hen several proposals for coal-related actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together."); *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 299 (D.C.Cir.1987) ("Environmental assessment on less than a systemwide scope may, in certain situations, lead to evaluation of segments in isolation of one another, thereby creating a misleading picture of the impact of the project as a whole."). Thus, in determining the consequences of a segment's abandonment, we follow a procedure that, without absolutely requiring an examination of the effects of every potential abandonment on the line at once, does require the ICC to review the effects of such aban-

donments on the adjacent segments should they occur.

▌ When segmentation of transportation lines is involved, we consider whether the segmentation satisfies three conditions: (1) does the proposed segment have logical termini?; (2) does the segment have substantially independent utility?; and (3) will abandonment of the disputed segment foreclose alternate treatment of the remaining segments?[5] *Swain v. Brinegar*, 542 F.2d at 369;[6] *Coalition on Sensible Transp., Inc. v. Dole*, 826 F.2d 60, 68 (D.C.Cir.1987); *Taxpayers Watchdog*, 819 F.2d at 298–99; *Piedmont Heights Civic Club, Inc. v. Moreland*, 637 F.2d 430, 439 (5th Cir. Unit B Feb.1981). The satisfaction of these three criteria tends to ensure that carriers will not abuse the out-of-service exemption by carving out one segment of a line in an attempt to make the remainder of the line useless and subject imminently to abandonment. We must, of course, be vigilant to detect and restrain the latter phenomenon should it appear. On the other hand, if a carrier legitimately decides, at a future time, to initiate abandonment proceedings on segments adjacent to an already abandoned piece, it will again have to take into account the consequences of the proposed abandonment on the surrounding segments (including the already abandoned segment). The carrier will have to make sure that the three criteria we have mentioned are satisfied. *See, e.g., Kleppe v. Sierra Club*, 427 U.S. at 410 n. 20, 96 S.Ct. at 2730 n. 20 ("Should contemplated actions later reach the stage of actual proposals, impact statements on them will take into account the effect of their approval upon the existing environment; and the condition of that environment presumably will reflect earlier proposed actions and their effects."); *Coalition on Sensible Transp., Inc.*, 826 F.2d at 71 (quoting *Kleppe v. Sierra Club*); *City of West Chicago*, 701 F.2d at 650–51. And Futurex and the UTU may protest future abandonments of these surrounding segments when such abandonments are actually proposed. *CSX Transportation,*

*Inc.—Exemption—Abandonment in Putnam and Parke Counties, IN*, at 3 (ICC Docket No. AB–55 (Sub–No. 222X)) (Jan. 11, 1988).

A minority of the Commission is presently indicating dissatisfaction with segmented abandonments. Theirs is not a frivolous concern. Carriers have the initiative in proposing the length of line to be abandoned. But, if a larger abandonment is contemplated, carriers should be encouraged to proceed with related elements together, where possible, rather than to permit the whole to be splintered into meaningless parts. The Commission should offer reasons for segmented consideration since this approach might be a means of pursuing abandonment without the most meaningful scrutiny.

In the case before us, however, the Commission considered the three factors cited above in upholding CSXT's exemption. For example, the Commission notes in its brief that "[t]his 14.58 mile segment of track, which has not generated any traffic for at least two years and is not needed to serve overhead traffic, poses very different transportation considerations than either of the adjoining segments would, because these adjoining sections are actively used and would not be eligible for the Out-of-Service Exemption." Respondent's Brief at 13. *See CSX Transportation, Inc.—Exemption—Abandonment in Putnam and Parke Counties, IN*, at 2 (ICC Docket No. AB–55 (Sub–No. 222X)) (Oct. 27, 1988). These facts tend to satisfy the first two criteria: the choice of the segment's termini—Bloomingdale and Russellville—seems not to be arbitrary or capricious, given the complete absence of traffic on the line between these two municipalities. *Compare Swain v. Brinegar*, 542 F.2d at 370 (choice of northern terminus—located "near no major crossroad, population center or traffic generator"—was not logical). And the segment's substantially independent utility is somewhat defined by its complete lack of traffic, unlike the adjacent segments. The

---

**5.** The fourth condition—whether the project will irretrievably commit federal funds—is inapplicable here.

**6.** *Swain v. Brinegar* restates these factors later in the opinion in a slightly different form:

third criterion—that abandonment will not foreclose alternate treatment of the remaining segments—has also been considered: since, at present, *no* traffic is crossing the Bloomingdale–Russellville segment, its abandonment will neither affect existing traffic patterns nor unduly restrict future treatment of the mainline.[7] We conclude that the Commission's treatment of the validity of the segment and its decision to concentrate on the environmental and economic effects caused by abandoning the Bloomingdale–Russellville segment were neither arbitrary nor capricious.

### B. Efficiency and Profitability: The Commission's Refusal to Revoke CSXT's Exemption

Thus, we have found that the Commission in this case properly focused on the environmental and economic effects of abandoning only the Bloomingdale–Russellville segment. The second issue is whether this review of that segment was adequate. In order to qualify its segment for exemption, CSXT certified that

(1) no local traffic has moved over the line for at least two years prior to the date hereof; (2) overhead traffic on the line has been rerouted over other lines; and (c) [sic] no formal complaint filed by a user of rail service on the line (or state or local governmental agency acting on behalf of such user) regarding cessation of service over the line is either pending

with the Commission or any U.S. District Court or has been decided in favor of a complainant within the two-year period prior to the date hereof.

CSXT's Notice of Exemption, Exhibit A (Nov. 20, 1987). *See* 49 C.F.R. § 1152.50(b) (1988). Futurex and the UTU do not challenge parts (1) and (c) of this certification. Of the three parts, they dispute only part (2): they allege that CSXT has not demonstrated that it efficiently rerouted overhead traffic. They also add one allegation of their own: they argue that CSXT has not rebutted their claim that operations on the rerouted lines are being conducted at an avoidable loss.

We begin with the proposition that decisions to reroute rail traffic are ordinarily within the discretion of the carrier. *Illinois v. ICC,* 751 F.2d 903, 905 (7th Cir.1985); *Illinois v. ICC,* 698 F.2d 868, 873 (7th Cir.1983). CSXT acted within this discretion by rerouting trains in 1987 and 1988 when few cars traversed its existing routes, particularly the Bloomingdale–Russellville segment. Despite this discretion, parties opposing exemption may still challenge the carrier's proposed abandonment by demonstrating that it has not *efficiently* rerouted its overhead traffic. *Illinois Commerce Comm'n v. ICC,* 848 F.2d at 1250 n. 6. Indeed, Futurex and the UTU argue this point, contending generally (without providing examples) that CSXT's new routes are inefficient.[8]

---

1. Does the proposed segment have a substantial utility independent of future expansion?
2. Would its construction foreclose significant alternative routes or locations for an extension from the segment?
3. If, as here, the proposed segment is part of a larger plan, has that plan become concrete enough to make it highly probable that the entire plan will be carried out in the near future?

542 F.2d at 369. Since we have concluded that CSXT's potential abandonment of adjacent segments is not yet sufficiently concrete, under our jurisprudence the difference between these two formulations is not material here.

7. Of course, the abandonment of a segment, to *some degree,* will always restrict some alternatives. The issue to be considered in this regard, however, is whether the abandonment "effec-

tively commits decisionmakers to a future course of action...." *Coalition on Sensible Transp., Inc. v. Dole,* 826 F.2d at 69.

8. Despite its finding that CSXT's rerouting was "efficient," the Commission proclaimed in its denial of Futurex's Petition to Reopen that, in any event, "[t]here is no requirement in our regulations that the rerouting be 'efficient.'" *CSX Transportation, Inc.—Exemption—Abandonment in Putnam and Parke Counties, IN,* at 3 (ICC Docket No. AB–55 (Sub–No. 222X)) (June 7, 1989). We cannot agree. The Commission itself noted in *Exemption of Out of Service Rail Lines,* 2 I.C.C.2d 146 (1986), that "to use this exemption, a carrier must certify that the overhead traffic on the line, if any, can be rerouted efficiently." *Id.* at 151. And the Court of Appeals for the D.C. Circuit relied upon this language in sustaining an ICC decision. *Illinois*

Such a broad claim, however, does not rebut CSXT's assertion that " 'for the vast majority of overhead traffic formerly using this line, the alternate routes are at least as efficient as the old routes via the line at ... issue.' " *CSX Transportation, Inc.— Exemption—Abandonment in Putnam and Parke Counties, IN,* at 3 & n. 5 (ICC Docket No. AB–55 (Sub–No. 222X)) (Sept. 14, 1988). Indeed, the decisions have "preserved the existing transit times for over 95 percent of the traffic" by rerouting infrequent overhead traffic into high-density, high-speed mainlines running north or south of Hillsdale. Respondent's Brief at 9. *See Pittsburgh & Lake Erie R.R. v. ICC,* 796 F.2d 1534, 1542 (D.C.Cir.1986) (upholding Commission finding that "more circuitous routes could sometimes be more efficient when traffic is aggregated (*i.e.,* when cars are pooled in order to take advantage of lower overall costs)"). And Futurex has not proven that its shipments have been affected in the least by the rerouting: its Marshall plant did not receive any cars in the two years prior to CSXT's filing for exemption, and its Bloomingdale plant makes and receives shipments from points to the west and southwest of Bloomingdale. Respondent's Brief at 9 n. 8. *Cf. Illinois v. ICC,* 698 F.2d at 871 (balancing test for customary abandonments weighs interests of those being served on line against interests of carrier and transportation system). Thus, Futurex and the UTU have not demonstrated that CSXT inefficiently rerouted the overhead traffic.

Futurex's argument that CSXT's rerouting was unprofitable fares no better. Profitability is not one of the relevant factors in determining whether a carrier has properly invoked the out-of-service exemption. *See* 49 C.F.R. § 1152.50(b) (1988). Presumably, once a line satisfies the criteria for the out-of-service exemption, it would be illogi-

cal to require the carrier to forego a more profitable use of its resources elsewhere. *Illinois v. ICC,* 698 F.2d at 875. And given the fact that *no* traffic crossed the Hillsdale–Russellville segment for two years— and the fact that the overhead traffic was rerouted efficiently—profitability analysis may be redundant.

Futurex and the UTU are left with 49 U.S.C. section 10505(d), which states that "[t]he Commission may revoke an exemption, to the extent it specifies, when it finds that application of a provision of this subtitle to the person, class, or transportation is necessary to carry out the transportation policy of section 10101a of this title." But aside from the challenges already considered, Futurex and the UTU have not demonstrated that the nation's transportation policy requires the revocation of the segment's exemption.

### III.

Railroad carriers may not abandon discrete segments of their lines in order to render the adjacent segments valueless. To this end, we will not allow carriers to embark upon programs of total abandonment by fragmenting valuable lines into less than valuable parts. It is important that a carrier make a preliminary showing to the ICC that its abandonment of a segment has logical termini, has substantially independent utility and will not foreclose future alternatives for the mainline. When challenged, the carrier should also, if possible, attempt to justify any segmentation that may be evident. But it is, of course, ultimately the shipper's responsibility to demonstrate that the line in question should not be deemed out-of-service. Futurex and the UTU have failed to make this demonstration. The final decision of the Commission is therefore

AFFIRMED.

*Commerce Comm'n v. ICC,* 848 F.2d at 1250 n. 6. Since the Commission in the case before us went on to consider whether the rerouting was

efficient, however, this point had little bearing on the final decision.