95 F.3d 740
 CADDO ANTOINE AND LITTLE MISSOURI RAILROAD COMPANY; GS
Roofing Products Company, Inc.; Beazer West, doing business
as Gifford-Hill & Company, Inc.; Bean Lumber Company; Curt
Bean Lumber Company; Barksdale Lumber Company, Inc., Petitioners,
v.
UNITED STATES of America; Surface Transportation Board, Respondents,
Arkansas Midland Railroad Company, Incorporated, Intervenor.
Glenwood and Southern Railroad Company, Amicus Curiae.
CADDO ANTOINE AND LITTLE MISSOURI RAILROAD COMPANY;
Dardanelle & Russellville Railroad Company; GS Roofing
Products Company, Inc., Beazer West doing business as
Gifford-Hill & Company, Inc.; Bean Lumber Company; Curt
Bean Lumber Company; Barksdale Lumber Company, Inc., Petitioners,
v.
UNITED STATES of America; Surface Transportation Board, Respondents.
Glenwood and Southern Railroad Company, Amicus Curiae.
 Nos. 95-2006, 95-2582.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 13, 1995.
Decided Sept. 13, 1996.
 
 Richard Streeter, Washington D.C., argued (Mark J. Andrews and Robert S. Hargraves, on the brief), for petitioners.
 Laurence R. Latourette and Craig M. Keats, Washington, D.C., argued (Lisa M. Helpert, Robert B. Nicholson, John P. Fonte and Evelyn G. Kitay, on the brief), for respondent.
 Before FAGG, WOLLMAN, and BEAM, Circuit Judges.
 WOLLMAN, Circuit Judge.
 
 
 1
 This case involves consolidated petitions for review of decisions of the Interstate Commerce Commission (Commission).[1]
 
 
 2
 No. 95-2006 is a petition for review of the Commission's April 18, 1995, decision granting in part the application of the Caddo Antoine and Little Missouri Railroad Company to purchase under the feeder line development provisions of 49 U.S.C. § 10910 a 52.9-mile line of railroad located in southwestern Arkansas, known as the Norman Branch. Caddo Antoine and Little Missouri Railroad Company--Federal Line Acquisition--Arkansas Midland Railroad Company Line Between Gurdon and Birds Mill, AR, Finance Docket No. 32479 (April 18, 1995).
 
 
 3
 No. 95-2582 is a petition for review of the Commission's June 15, 1995, decision declining to extend a service order authorizing the Dardanelle and Russellville Railroad Company to operate over the Norman Branch.
 
 I.
 
 4
 The petitioners are the Caddo Antoine and Little Missouri Railroad Company (CALM), five of the six shippers located on the Norman Branch, and Dardanelle and Russellville Railroad Company (D & R), which is an Arkansas-based short line railroad. Caddo Antoine and Little Missouri Railroad Company (CALM) is a non-carrier subsidiary of D & R. Both D & R and CALM are controlled by the five petitioners/shippers identified below. Arkansas Midland Railroad Company (Arkansas Midland), the intervenor in this action, is a subsidiary of the Massachusetts-based Pinsly Railroad Company, Inc.[2] Arkansas Midland acquired ownership of the Norman Branch from the Union Pacific in February of 1992. In addition to the Norman Branch, Arkansas Midland consists of three additional branches: the Carlisle Branch, the Hot Springs Branch, and the Helena Branch, all of which are located within the state of Arkansas.
 
 
 5
 Since its completion in the early part of this century, the Norman Branch has been operated as a single line of railroad extending from its point of interchange with what was formerly the Missouri Pacific Railroad (now a part of the Union Pacific Railroad) at milepost 426.3 near Gurdon, Arkansas, to milepost 479.2 near Birds Mill, Arkansas.
 
 
 6
 On December 3, 1993, storm damage occurred at mileposts 475.9 and 477.2, near the northernmost tip of the Norman Branch. On December 16, 1993, Arkansas Midland announced an embargo of rail shipments to four of the six shippers on the Norman Branch: GS Roofing Products Company, Inc., Bean Lumber Company, Curt Bean Lumber Company, and Barksdale Lumber Company. On February 22, 1994, Arkansas Midland extended its embargo to terminate service to petitioner Beazer West, Inc. d/b/a Gifford-Hill & Company, which is located at milepost 446.6 on the Norman Branch. Arkansas Midland continued to provide service to the sixth shipper on the line, International Paper Company (International Paper), which is located at milepost 428.9 at the southernmost tip of the line, some 2.07 miles from the point of interchange with the Union Pacific line at Gurdon.
 
 
 7
 In response to the notice of embargo, the embargoed shippers entered into negotiations with Arkansas Midland and the Union Pacific in an attempt to have Arkansas Midland restore rail service on the remainder of the Norman Branch. The Union Pacific offered financial assistance in excess of $1.1 million in the form of increased car fees and track materials. The petitioner shippers offered financial assistance and intervened with Arkansas state officials to obtain funds for Arkansas Midland to use to make repairs to the line.
 
 
 8
 In addition to refusing to make the repairs or to restore service, Arkansas Midland filed a system diagram map (SDM) with the Commission on February 18, 1994, on which it designated the entire Norman Branch as being a candidate for abandonment. Thereafter, Arkansas Midland amended its SDM to modify the designation of the southernmost 3.7-mile portion of the line, on which International Paper is located. That portion of the line was changed from a category 1 status, which designates a line as being a candidate for immediate abandonment, to a category 5 status, meaning that operations would continue over that portion of the line. See 49 C.F.R. §§ 1152.10(b)(1) and (5).
 
 
 9
 In response to the prospect of losing railroad service, the five embargoed shippers took three related actions. First, they requested that CALM file a feeder line application in order to acquire the entire Norman Branch. Second, they asked CALM to file an emergency petition with the Commission seeking a directed service order that would allow CALM to begin immediate operations over the entire line. Finally, they filed a damage action against Arkansas Midland.
 
 
 10
 The feeder line application and the request for a directed service order were filed with the Commission on March 18, 1994.[3] Because CALM was not aware of the amendment to Arkansas Midland's SDM when it filed its feeder line application, the application initially referred to 49 U.S.C. § 10910(b)(1)(A)(ii), which relates to lines designated for abandonment, as providing the basis for the acquisition of the entire Norman Branch. The application further indicated, however, that "CALM will seek a finding by the Commission that public convenience and necessity permit or require acquisition."
 
 
 11
 Arkansas Midland filed a response opposing the request for a directed service order, referring to that portion of the Norman Branch line north of milepost 430.0 as the "northern segment."
 
 
 12
 On March 28, 1994, the Commission issued an emergency service order pursuant to 49 U.S.C. § 11123(a)(1) authorizing the D & R and CALM to "enter upon and operate [Arkansas Midland's] Norman Branch." The service order authorized D & R/CALM to operate over the full extent of the Norman Branch, but permitted it to provide service only to the five shippers located on the 49.2 miles of track located north of milepost 430.0. Arkansas Midland was authorized to continue serving International Paper, the sole shipper located on the 3.17-mile portion of the line between milepost 430.0 and the point of interchange with the Union Pacific Railroad. Thereafter, the service order, which was originally issued for a period of thirty days, was extended and was scheduled to expire at 11:59 p.m. on June 15, 1995.
 
 
 13
 On April 12, 1994, the Commission published its notice of acceptance of CALM's feeder line application in the Federal Register, 59 Fed.Reg. at 17400, establishing a deadline of May 12, 1994, for the receipt of competing applications.
 
 
 14
 In compliance with the notice, CALM filed comments and evidence in support of its showing that the public convenience and necessity required or permitted the sale of the entire Norman Branch. CALM alleged that if International Paper was not included among the shippers it could serve on the Norman Branch, it projected a net operating loss of $124,701, whereas it expected to achieve net annual operating income of $264,649 if it was permitted to acquire the entire Norman Branch and to serve all six shippers located thereon.[4]
 
 
 15
 The five embargoed shippers submitted statements in support of CALM's acquisition of the entire Norman Branch. They alleged that they had already suffered damages in excess of $650,000 because of failure to obtain rail service from Arkansas Midland and that they would be forced to shut down or severely curtail their operations if reliable rail service was not restored and maintained. International Paper filed a one-page statement saying that it would like to have Arkansas Midland continue to serve its plant rather than to have Arkansas Midland be forced to sell to CALM that portion of the Norman Branch that serves International Paper.
 
 
 16
 In its response to CALM's feeder line application, Arkansas Midland recited the worsening track conditions, declining car loads and revenues, and increasing losses it had experienced on the Norman Branch. It alleged that International Paper is the second largest shipper on Arkansas Midland's entire system, the loss of which would put Arkansas Midland at serious financial and operational risk. Included within Arkansas Midland's reply to CALM's application was a statement of Michael P. Root, the majority stockholder, president and director of the Glenwood & Southern Railroad Company (GSR), which set forth that GSR had entered into a lease and option to purchase agreement with Arkansas Midland to purchase and operate the Norman Branch from milepost 430.0 to milepost 479.2.
 
 
 17
 GSR filed a notice seeking an exemption from the otherwise applicable regulatory requirements to permit it to acquire and operate the Norman Branch. GSR and Arkansas Midland also filed a joint petition to terminate the earlier-issued service order permitting the D & R to operate the line. Thereafter, the Commission issued decisions ordering GSR not to consummate its proposed transaction with the Arkansas Midland, denying Arkansas Midland and GSR's motion to dismiss CALM's feeder line application, and rejecting GSR's notice of exemption.
 
 
 18
 In November 1994, GSR filed a competing feeder line application. On March 9, 1995, the Commission issued a decision, which has not been challenged on judicial review, affirming the decision of its Director, Office of Proceedings, that GSR had not sufficiently shown that it was a financially responsible person, as required by 49 U.S.C. § 10910(a).
 
 
 19
 The Commission concluded in its April 18, 1995, decision on CALM's feeder line application that the feeder line statute did not authorize it to direct the forced sale of the entire Norman Branch. It found that because the northern segment had been listed on Arkansas Midland's SDM as a category 1 candidate for abandonment and because service on that segment was inadequate, CALM was entitled to purchase that portion of the line under the provisions of section 10910(b)(1)(A)(ii). The Commission found that CALM had made a showing of financial responsibility sufficient to satisfy the Commission that it would be likely to be able to cover expenses for three years.
 
 
 20
 The Commission then considered the 3.7-mile southern segment of the line under the public convenience and necessity (PC & N) standard of section 10910(b)(1)(A)(i). Because CALM had submitted no PC & N evidence regarding the southern segment standing alone, the Commission granted the feeder line application only as to the northern segment. Because it believed that operations serving only the five shippers located north of milepost 430.0 would be incapable of sustaining an operating profit, CALM declined to acquire this truncated portion of the Norman Branch.
 
 
 21
 Following the entry of the Commission's decision, petitioners sought an extension of the service order under which D & R/CALM had been providing service during the pendency of CALM's feeder line application. In response, the Commission agreed to only a thirty-day extension. On May 17, 1995, GSR filed an ex parte notice of exemption to lease and operate the portion of the Norman Branch north of milepost 430.0. On May 31, 1995, petitioners filed a motion to have GSR's notice of exemption declared void. On the same day, CALM requested an extension of the service order pending completion of judicial review. On June 15, the Commission issued its decision granting only a fifteen-day extension and ordering CALM to clear the Norman Branch of its equipment and supplies and cease rail operations on the Norman Branch by 11:59 p.m., June 30, 1995. On June 29, 1995, we granted petitioners' motions for stay of the Commission's April 18 and June 15, 1995, decisions pending judicial review.
 
 II.
 
 22
 The petitioners contend that the Commission erroneously and artificially bifurcated the Norman Branch into a "northern" and "southern" segment in an attempt to circumvent the otherwise logical conclusion that the entire Norman Branch is a "particular railroad line" as that term is used in section 10910(b)(1)(A)(i). They contend that the Commission's "two line" assumption is not only arbitrary but is at odds with the text of the statute, pointing out that although other portions of the statute contemplate transactions involving a "part" or a "portion" of a line, section 10910(b)(1)(A)(i) speaks only in terms of a "particular railroad line" and not in terms of a part or portion of a line. For example, sections 10903(a)(1) and (2) provide that a rail carrier may abandon "any part" or discontinue the operation over "any part" of its railroad lines. Sections 10905(b)(1), (d)(1), and (f)(4) relate to offers of financial assistance to maintain service on all or a "portion" or "part" of an abandoned railroad line. Section 10910(h) provides that a purchasing carrier may propose to sell or abandon "all or any portion of a purchased railroad line."
 
 
 23
 Arkansas Midland, on the other hand, argues that the feeder line development program was never intended to give an adversary carrier a mechanism by which to force a rail carrier to sell a profitable segment of line which is adjacent to a line being abandoned.
 
 III.
 
 24
 Concerned about the deteriorating rail service provided on some of the secondary railroad lines throughout the country, Congress enacted the Staggers Rail Act of 1980 (the Act). The Act is codified at 49 U.S.C. § 10910 and provides two methods whereby a line of railroad can be acquired other than through a mutually agreed upon sale and purchase. The relevant portions of the Act read as follows:
 
 
 25
 § 10910. Railroad development
 
 
 26
 (a) In this section--
 
 
 27
 (1) "financially responsible person" means a person who
 
 
 28
 (A) is capable of paying the constitutional minimum value of the railroad line proposed to be acquired, and (B) is able to assure that adequate transportation will be provided over such line for a period of not less than 3 years. Such term includes a governmental authority but does not include a class I or a class II rail carrier.
 
 
 29
 ...
 
 
 30
 (b)(1) When the Interstate Commerce Commission finds that--
 
 
 31
 (A)(i) the public convenience and necessity require or permit the sale of a particular railroad line under this section; or
 
 
 32
 (ii) a railroad line is on a system diagram map as required under section 10904 of this title, but the rail carrier owning such line has not filed an application to abandon such line under sections 10903 and 10904 of this title before an application to purchase such line, or any required preliminary filing with respect to such application, is filed under this section; and
 
 
 33
 (B) an application to purchase such line has been filed, in accordance with regulations required under subsection (k) of this section, by a financially responsible person, the Commission shall require the rail carrier owning the railroad line to sell such line to such financially responsible person at a price not less than the constitutional minimum value.
 
 
 34
 ...
 
 
 35
 (c)(1) For purposes of this section, the Commission may determine that the public convenience and necessity require or permit the sale of a railroad line if the Commission determines, after a hearing on the record, that--
 
 
 36
 (A) the rail carrier operating such line refuses within a reasonable time to make the necessary efforts to provide adequate service to shippers who transport traffic over such line;
 
 
 37
 (B) the transportation over such line is inadequate for the majority of shippers who transport traffic over such line;
 
 
 38
 (C) the sale of such line will not have a significantly adverse financial effect on the rail carrier operating such line;
 
 
 39
 (D) the sale of such line will not have an adverse effect on the overall operational performance of the rail carrier operating such line; and
 
 
 40
 (E) the sale of such line will be likely to result in improved railroad transportation for shippers that transport traffic over such line.
 
 
 41
 ...
 
 Emphasis Added.[5]
 
 42
 Whether the difference between the descriptive terms "a particular railroad line," as set forth in section 10910(b)(1)(A)(i), and "any part," "portion," or "part," as used in the other statutes cited above, would be controlling in the absence of further circumstances, we need not say. Rather, as we conclude below, when viewed in the light of the history of the operation of the Norman Branch, the circumstances under which Arkansas Midland and the Commission bifurcated the line, and the legislative history of the feeder line development program, the term "a particular railroad line" in the circumstances of this case includes the Norman Branch in its entirety.
 
 IV.
 
 43
 The legislative history of section 10910 explains Congress's purpose in enacting the feeder line development program provisions of the Act:
 
 
 44
 To provide shipper groups and government agencies an alternative to inadequate rail service and to preserve feeder lines prior to the total downgrading of such lines, the House amendment provides for a feeder line development program which would require a rail carrier to sell a railroad line to a financially responsible person at a price not less than the constitutional minimum, if the Commission makes a finding that the present or future public convenience and necessity required or permitted the abandonment or discontinuance of a railroad line, or if the Commission makes a finding that the transportation provided over a particular line is inadequate. Inadequate transportation is defined by five criteria. The Commission must affirmatively determine the existence of the conditions set forth in all five criteria as a prerequisite to the sale of a railroad line under this section. The burden of proving inadequacy of service is on the person filing to acquire the rail line.
 
 
 45
 ....
 
 
 46
 The Conferees believe that the feeder line program will give shippers and communities an opportunity to insist upon adequate rail service. Where such service is not forthcoming the provision provides, through acquisition, a viable alternative to poor service or total abandonment.
 
 
 47
 H.Conf.Rep. No. 1430, 96th Cong., 2nd Sess. 124, reprinted in 1980 U.S.C.C.A.N. 4110, at 4156-57. (For a review of the circumstances leading to the enactment of the Act and the purposes it was designed to achieve, see Simmons v. I.C.C., 871 F.2d 702, 706-07 (7th Cir.1989).) As the Commission has recognized, "The overriding intent of the feeder line provisions is to preserve service over lines that may be abandoned or downgraded." Sandusky County-Seneca County-City of Tiffin Port Authority--Feeder Line Application, 1990 WL 288059, * 3 (I.C.C.).
 
 V.
 
 48
 We undertake our review of the Commission's decision cognizant that "we must defer to the [Commission's] interpretation of the statutes or regulations it administers 'unless there are compelling indications that the Commission's interpretation is incorrect.' " Simmons v. I.C.C., 871 F.2d at 705 (quoting Black v. I.C.C., 762 F.2d 106, 114-15 (D.C.Cir.1985)). We are to ask only whether, in those cases in which Congress has not directly addressed the precise question at hand, the Commission's action "is based on a permissible construction of the statute." Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). With all due respect to the Commission, we conclude that its interpretation of section 10910(b)(1)(A)(i) in the circumstances of the present case is not a permissible construction of the statute, for, as we view the case, the Commission's interpretation frustrates rather than effectuates the purposes which the feeder line development program was designed to achieve.
 
 
 49
 As indicated above, section 10910 establishes alternate bases for permitting approval of feeder line applications where the owning carrier is either not providing adequate service or has identified the line in category 1 or 2 on its SDM as a candidate for abandonment but has not yet applied for abandonment. Although an SDM designation may eliminate the necessity for the applicant to prove inadequate service, we conclude that the statute does not preclude the Commission from considering an application under the PN & C standard simply because a line owner providing inadequate service to a majority of the shippers on the line decides to place a portion of the line on its SDM.
 
 
 50
 In its July 24, 1991, revision of its feeder railroad development rules, the Commission discontinued its automatic rejection policy for feeder line applications filed after the filing of an overlapping abandonment application, explaining that
 
 
 51
 [u]nder § 10910, a line is available for forced sale if either: (1) the owning carrier has identified the line in category 1 or 2 of its SDM as a candidate for abandonment but has not yet applied for abandonment authority ("SDM standard"); or (2) the operating carrier is not providing adequate service ("PC & N standard"). Under either standard the applicant must show that it is a financially responsible person and the Commission must establish the constitutional minimum value of the line.
 
 
 52
 Only the SDM standard explicitly excludes lines already subject to pending abandonment applications. Nothing in the statute precludes the PC & N standard from applying to lines already the subject of abandonment applications. There is no language to limit its use, as is the case with the separate SDM standard. Clearly, if Congress had intended that we reject all post abandonment feeder line applications, it easily could have included limiting language in the PC & N subsection. By its failure to do so, we may infer that Congress envisioned circumstances where it would be appropriate for us to consider and grant post-abandonment feeder line applications.
 
 
 53
 ....
 
 
 54
 A rigid automatic rejection policy does not harmonize well with the rail transportation policies of preserving rail service and reducing regulatory barriers to entry, particularly when the abandonment application does not encompass all of the line sought in the feeder line application. Additionally, the automatic rejection policy leads to an undesirable filing race. This results from the line owner's ability to abort unilaterally a feeder line application by submitting an abandonment application first, even if it is filed just a few minutes before the feeder line application and covers only a small portion of a longer line covered by the feeder line application....
 
 
 55
 7 I.C.C. 902, 911, 913 (1991) (footnotes omitted).
 
 
 56
 We agree with petitioners that the Commission's position with respect to considering after-filed feeder line applications in abandonment cases is inconsistent with the position it has taken in the present case. The rejection of CALM's application to acquire the entire Norman Branch does not harmonize well with the policies of preserving rail service and reducing regulatory barriers to entry.
 
 
 57
 As we read the Commissioner's revised policy, it is designed to prevent what appears to have occurred in the present case, i.e., the owning carrier (Arkansas Midland) downgrades (by failing to maintain and repair its tracks) services over a portion of its line that it deems more expensive to operate, while maintaining service to a single shipper that it deems easier and more profitable to serve, and then files a SDM covering only the undesirable portion of the line shortly before the abandoned shippers are able to file a feeder line application. If the Commission's position is affirmed in this case, Arkansas Midland will have succeeded in lopping off service to the majority of its former shippers while "cherry-picking" the single, more easily served shipper on the remaining seven percent of the line it elected to retain. There may be situations in which such a result may ultimately obtain, as, for example, where no carrier files an application to acquire the portion of the line sought to be abandoned. But that is not the situation here, where CALM desires to acquire a line that from the date of its construction has been operated as a unitary line of railroad.
 
 
 58
 The Norman Branch presents the type of situation that the feeder line development program was designed to address. Arkansas Midland, for whatever reasons of its own, apparently overstated the damages resulting from the December 3, 1993, storm (CALM alleges that the storm damage was minimal and was repaired in less than four hours once it and D & R were authorized to commence operations over the line). Rather than try to repair this relatively minor damage, Arkansas Midland used the damage as a justification for embargoing further shipments on the greater portion of the line, leaving the petitioner shippers to fend for themselves. Accordingly, in light of CALM's application to provide service over the entire length of the Norman Branch, a line that had historically been operated as a unitary operation, the Commission should have treated the entirety of the Norman Branch as "a particular railroad line" and thus have reviewed CALM's application under the PN & C standard of section 10910(b)(1)(A)(i) rather than under (A)(ii).
 
 
 59
 The Commission contends that its decisions to segment lines designated for abandonment have been consistently endorsed by the courts. For example, in Futurex Industries, Inc. v. I.C.C., 897 F.2d 866, 870-73 (7th Cir.1990), the court held that the Commission's decision to approve the abandonment of a 14.58-mile segment of track was not arbitrary or capricious. In reaching this conclusion, the court noted that:
 
 
 60
 When segmentation of transportation lines is involved, we consider whether the segmentation satisfies three conditions: (1) does the proposed segment have logical termini?; (2) does the segment have substantially independent utility?; and (3) will abandonment of the disputed segment foreclose alternate treatment of the remaining segments? The satisfaction of these three criteria tends to ensure that carriers will not abuse the out-of-service exemption by carving out one segment of a line in an attempt to make the remainder of the line useless and subject imminently to abandonment. We must, of course, be vigilant to detect and restrain the latter phenomenon should it appear.
 
 
 61
 Id. at 872 (footnote and citations omitted). In Indiana Sugars, Inc. v. I.C.C., 694 F.2d 1098 (7th Cir.1982), the court held that the Commission acted arbitrarily and capriciously in not bifurcating from a proposed 42.89 mile abandonment of a seven-mile segment of track on which a showing of serious shipper need had been established.
 
 
 62
 We agree with the petitioners that neither of those holdings controls our decision in the present case. To say that the Commission was warranted in segmenting a portion of line in one case and was not warranted in not segmenting a portion of line in another is hardly the same that it must segment in all cases. The Commission itself has acknowledged that its analytical focus should "be on the ultimate issue: whether abandonment of one segment would foreclose the viability of contiguous segments, making their eventual abandonment a foregone conclusion." Central Michigan Railway Co.--Abandonment--East of Ionia to West of Owosso--In Michigan, 8 I.C.C.2d 166, 173 (1991).
 
 
 63
 Although the Commission cites Cheney Railroad Co. v. I.C.C., 902 F.2d 66 (D.C.Cir.), cert. denied, 498 U.S. 985, 111 S.Ct. 519, 112 L.Ed.2d 530 (1990), in support of its decision to segment the Norman Branch, we conclude that that case has little relevance to the facts of the present case. Cheney involved a line of railroad that had been designated for abandonment in its entirety. Cheney filed an application to purchase the entire route. Tyson Foods filed an application to purchase only the 1.61-mile segment on which its plant was located. The question for decision was whether the Commission was required to consider the applications only in the order received and to accept the first qualifying application filed, or whether it could divide the line between applicants. The Commission's decision to do the latter was upheld. Cheney involved an abandonment, however, and thus was governed by the provisions of section 10910(b)(1)(A)(ii), rather than (A)(i). In light of our holding that the Commission should have considered CALM's application to purchase the entire Norman Branch under the PN & C provisions of (A)(i), we find Cheney to be inapposite. We do note, however, the Cheney court's approval of the Commission's reasoning that to consider applications one at a time might delay transfer of a line, which " 'would be contrary to the purposes of the feeder line development program, one of which is to preserve feeder lines.' " Cheney, 902 F.2d at 69 (quoting 5 I.C.C.2d 250, 254 (1989)). The Cheney court went on to characterize the Commission's decision as "both reasonable in itself and faithful to a Staggers Act objective 'to preserve [rail] service to protect existing shippers.' " Id. (quoting Simmons v. I.C.C., 697 F.2d 326, 329 (D.C.Cir.1982)). If, as the Cheney court noted, and as we have found, the purpose of the feeder line development program is to preserve feeder lines and to preserve service to existing shippers, then to segment the Norman Branch so as to deny CALM the right to bid for the entire line under the provisions of (A)(i) would be to frustrate those purposes in light of the evidence that the revenue from the northern segment will never be adequate to preserve the line and to protect the five shipper petitioners. In a word, what the Commission has done in this case is that which it said in Central Michigan Railway Co. it should guard against: a segmentation of lines that would have the effect of foreclosing the viability of contiguous segments, making their eventual abandonment a foregone conclusion.
 
 
 64
 In reaching this conclusion, we have considered Arkansas Midland's contention that it will suffer grievous financial loss that will jeopardize the remainder of its rail line operations if it is required to sell the 3.7-mile portion of the line serving International Paper. That argument, however, will be a factor to be taken into account when the Board considers CALM's application in the light of the five criteria set forth in section 10910(c)(1). Likewise, it will be for the Board to determine, as it did with respect to CALM's ability to operate the northern 49.2-mile segment of the Norman Branch, whether CALM has the financial resources to operate the entire Norman Branch.
 
 
 65
 Our interpretation of section 10910 may strike some as reflecting a utilitarian view of the law--the greatest good for the greatest number of shippers. Nevertheless, we conclude that the words "a particular railroad line," when viewed in the light of the history of the Norman Branch, the purposes of the feeder line development program, and the circumstances of this case, must be read to describe the entirety of the Norman Branch. Thus, on remand the Board must consider under the provisions of section 10910(b)(1)(A)(i) CALM's application to purchase the entire line. What decision the Board may reach, we do not know. In any event, we are satisfied that our holding, narrow as it is, will not result in the widespread depredation of the weak by the strong in the short line railroad industry.
 
 VI.
 
 66
 In No. 95-2006, we reverse the Commission's decision and remand the case to the Board for further proceedings consistent with the views set forth in this opinion.
 
 
 67
 In No. 95-2582, we direct the Board to extend the service order authorizing CALM/D & R to continue providing service over the Norman Branch pending disposition of CALM's application to purchase the entire Norman Branch.
 
 
 
 [1]
 Section 101 of the ICC Termination Act of 1995, Pub.L. No. 104-88 (effective January 1, 1996), abolished the Interstate Commerce Commission (ICC). Section 201 of that Act established the Surface Transportation Board. Section 204(c)(2) provides that the Board shall continue any suit brought by or against the ICC to the extent the suit involves ICC functions that have been transferred to the Board
 For ease of reference, we will use the term "Commission" throughout the opinion when we refer to past events, and we will use the term "Board" when we discuss actions to be taken on remand.
 
 
 [2]
 The Pinsly Railroad Company, Inc. also controls the following short line railroads: Florida Central Railroad, Florida Midland Railroad Company, Florida Northern Railroad, Greenville & Northern Railway Company, and Pioneer Valley Railroad
 
 
 [3]
 After notification by the Commission that CALM was not eligible to apply for a directed service order because it was not yet an operating railroad, D & R was substituted as the operating carrier for purposes of the emergency order
 
 
 [4]
 Indeed, CALM's predictions may have already been proved to be correct, for on August 27, 1996, we entered an order granting the emergency motion filed by the petitioner shippers authorizing them to engage an alternative carrier on the Norman Branch, D & R having advised the shippers that because it had lost more than $100,000 during the first seven months of 1996 operating the Norman Branch, it intended to cease operations on August 30, 1996
 
 
 [5]
 Sections 10903 and 10904 of Title 49 read as follows:
 § 10903. Authorizing abandonment and discontinuance of railroad lines and rail transportation
 (a) A rail carrier providing transportation subject to the jurisdiction of the Interstate Commerce Commission under subchapter I of chapter 105 of this title may--
 (1) abandon any part of its railroad lines; or
 (2) discontinue the operation of all rail transportation over any part of its railroad lines;
 only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance. In making the finding, the Commission shall consider whether the abandonment or discontinuance will have a serious, adverse impact on rural and community development.
 ...
 § 10904. Filing and procedure for applications to abandon or discontinue
 (a)(1) An application for a certificate of abandonment or discontinuance under section 10903 of this title, and a notice of intent to abandon or discontinue, must be filed with the Interstate Commerce Commission.
 ...
 (e)(2) Each rail carrier shall maintain a complete diagram of the transportation system operated, directly or indirectly, by the carrier. The carrier shall submit to the Commission and publish amendments to its diagram that are necessary to maintain the accuracy of the diagram. The diagram shall--
 (A) include a detailed description of each of its railroad lines potentially subject to abandonment; and
 (B) identify each railroad line for which the carrier plans to file an application for a certificate under subsection (a) of this section.